Arnold C. LIENEMANN, Administrator
of the Estate of John B. Lienemann,
Deceased, Appellee,

v.

STATE FARM MUTUAL AUTO FIRE
AND CASUALTY CO., Appellant.

Arnold C. LIENEMANN, Administrator
of the Estate of John B. Lienemann,
Deceased, Appellant,

v.

STATE FARM MUTUAL AUTO FIRE
AND CASUALTY CO., Appellee.

Nos. 75-1360, 75-1406.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 8, 1975.

Decided July 22, 1976.

334

Ray C. Simmons, Fremont, Neb., for State Farm.

C. J. Gatz, Jewell, Otte, Gatz, Collins & Domina, Norfolk, Neb., for Lienemann.

Before LAY, BRIGHT and HENLEY, Circuit Judges.

LAY, Circuit Judge.

This is an excess judgment case in which a jury found that State Farm Mutual Auto Fire and Casualty Company refused, in bad faith, to settle a suit against the estate of its insured, John B. Lienemann.

The events giving rise to the present suit began on February 11, 1968, when an automobile driven by John Lienemann collided head-on with a car in which Marvin Moats and his wife were riding near Norfolk, Nebraska. All three persons were killed. Thereafter, suits were brought against the Lienemann estate in Nebraska state court for the wrongful deaths of Mr. and Mrs. Moats. State Farm, which had insured Lienemann with limits of $20,000 for each person and $80,000 for each accident, defended the wrongful death suits. The suit involving Mr. Moats was tried to a jury and resulted in a finding that Lienemann had been negligent. A judgment of $46,037.12 was recovered in that action. During the appeal of that judgment,[1] a consent judgment for $27,500 was entered in Mrs. Moats' case.

Thereafter, the Lienemann estate brought the present suit in federal district court against State Farm to recover the amounts the estate was required to pay in excess of the policy limits; $26,037.12 on the claim of Mr. Moats and $7,500 on the claim of Mrs. Moats. The district court directed a verdict for State Farm with regard to Mrs. Moats' case on the ground that State Farm had voluntarily paid its policy limit and thus, as a matter of law, had not acted in bad faith on that claim. The district court submitted to the jury only the insurer's handling of the claim for Mr. Moats, and the jury returned a verdict for the Lienemann estate for $26,037.12.

State Farm appeals. The Lienemann estate cross-appeals from the directed verdict and from denial of attorney fees and prejudgment interest. We affirm the judgment of the district court.

*State Farm's Appeal.*

We first address the issues raised by State Farm: (1) whether the Lienemann

---

1. The judgment in favor of Marvin Moats estate was affirmed by the Nebraska Supreme Court, *Moats v. Lienemann,* 188 Neb. 452, 197 N.W.2d 377 (1972).

estate is estopped from bringing this suit by failure to make a separate offer to settle its excess liability; (2) whether the evidence is sufficient to sustain the award; and (3) whether the trial court erred in instructing the jury on bad faith.

## I.

■ After the wrongful death actions were filed, counsel for the Moats estates made several demands that State Farm and the Lienemann estate settle the cases in excess of the policy limits. State Farm refused to enter into negotiations but· on more than one occasion informed counsel for the Lienemann estate that the estate was free to settle for any amount over the policy's coverage. Just before and during trial, Lienemann counsel authorized a contribution of $7,500.00 over the policy limits. This amount, however, was never separately offered to the Moats estate by the Lienemann estate. State Farm now urges that the Lienemann estate is estopped to assert the insurer's bad faith because the estate had an opportunity to protect itself and failed to do so.

Nebraska law controls our decision. In *Olson v. Union Fire Ins. Co.,* 174 Neb. 375, 118 N.W.2d 318 (1962), the Nebraska Supreme Court answered this argument, stating:

An insurer may settle a claim within its limit of liability as it chooses since the insured cannot be injured by a settlement to be wholly paid by the insurer. The exclusive power to settle a claim within the limits of its liability is therefore ceded to the insurer for its sole benefit. *While an insured may compromise his possible liability over and above the limits of the insurance policy, he has no duty even to attempt to do so.* He may rely upon the policy, the promise to indemnify in a fixed amount, and the duty of the insurer to defend and to use its discretionary ·authority to settle in good faith. 118 .N.W.2d at 321 (emphasis added).

State Farm contends that *Olson* does not apply ·when the insured actively enters the settlement arena. We disagree. We find the language quoted above controlling.[2]

It is true that counsel for the estate attempted to negotiate an overall settlement. However, the estate had no authority from State Farm to settle the entire claim. Under the circumstances, State Farm cannot insist that the insured attempt to mitigate its risk alone. Otherwise, State Farm is in the anomalous position of asking the court to sanction the insured for failing to accept an offer which State Farm itself rejected as too high.

## II.

We move to State Farm's contention that the evidence is insufficient to support a finding of bad faith.

It was undisputed that the insured, Mr. Lienemann, aged 76, suffered a massive stroke while driving his car, immediately preceding the fatal collision. According to the testimony at trial, the Lienemann car went off the road on the right side for over $\frac{3}{10}$ of a mile, hit a ditch and sailed 42 feet through the air, traveled further .right, struck three steel fence posts and then veered left toward the highway. The car re-entered the highway and traveled north for approximately 3800 feet. During this time, the car swerved at least once into the southbound lane, forcing three southbound cars off the highway. The Lienemann auto swerved back into the northbound lane, barely missing the Mandel car. Mr. Mandel testified that the Lieneman car was proceeding at approximately 15 miles per hour at that time and that Mr. Lienemann was looking straight ahead. Thereafter, the Lienemann auto was unnoticed until it swerved back into the southbound lane at

---

**2.** State Farm urges that the New York decision in *Knobloch v. Royal Globe Ins. Co.,* 46 A.D.2d 278, 362 N.Y.S.2d 492 (N.Y.App.Div.1974) should control. The case is clearly distinguishable. In *Knobloch,* the New York court found that the *insured's* bad faith conduct, *after the insurer had offered its full liability limits,* estopped the insured from claiming the insurer's bad faith.

more than 50 miles per hour. This caused a car driven by Mr. Gray to move into the northbound lane to avoid a collision. The Moats auto was immediately behind the Gray car, and the Lienemann car collided head-on with the Moats car in the Moats' lane of travel. Mr. Moats was 39 years old. He and Mrs. Moats were survived by four minor children.

The insurer and the Lienemann estate relied on the defense of sudden illness, contending that the stroke had deprived Lienemann of all ability to control his car, so that he was not negligent. The medical testimony was conflicting. The Moats estates claimed that Lienemann was conscious and in control after the stroke, relying on evidence of the movement of the car some 3800 feet on the highway before the impact. They claim that Lienemann could and should have pulled off the highway and stopped his vehicle. The defense disputed this, urging that Lienemann was unconscious and unable to control the car. At trial in the wrongful death action, the jury found that Lienemann did have control of the car after his stroke and that he was negligent. The Nebraska Supreme Court affirmed the verdict, observing:

> The medical testimony regarding the ability of Lienemann to control his car is conflicting, but the jury could have found from this testimony that in order to drive the car the distance of 3,800 feet from the place where he returned to the highway after being in the ditch and not thereafter having left the 24-foot paved road, he had the ability to control the car, which would include the ability to stop the car, and that such action on his part is evidence of negligence.

197 N.W.2d at 380.

Although the Moats estates attempted to settle the wrongful death actions at various times, the attorneys retained by State Farm were instructed not to negotiate by the company.

Six weeks prior to trial, the Lienemann estate requested State Farm to offer the policy limits of $40,000 with an additional $5,000 contribution from the Lienemann estate in settlement of both wrongful death claims. State Farm declined, relying on what it considered to be the favorable testimony of three doctors and an opinion from an able independent attorney.

The parties proceeded to trial on the wrongful death claim of Mr. Moats. Immediately before and during trial, the plaintiffs, Moats estates, offered to settle both claims for $47,500. The Lienemann estate requested State Farm to agree to that compromise, but State Farm refused. The claim for Mr. Moats' death went to the jury, which returned a verdict of $46,037.12. Thereafter, a consent judgment was entered on the claim of Mrs. Moats in the sum of $27,500. The total excess judgment against the Lienemann estate was $33,537.12.

The controlling principles of law are found in *Olson, supra,* and the recent decision of the Nebraska Supreme Court in *Hadenfeldt v. State Farm Mutual Automobile Ins. Co.,* 195 Neb. 578, 239 N.W.2d 499 (Filed Mar. 11, 1976). In *Olson,* the court observed:

> The liability of an insurer to pay in excess of the face of the policy accrues when the insurer, having exclusive control of settlement, in bad faith refuses to compromise a claim for an amount within the policy limit. . . . In the event the insurer elects to resist a claim of liability, or to effect a settlement thereof on such terms as it can get, there arises an implied agreement that it will exercise due care and good faith where the rights of an insured are concerned.
>
> \* \* \* \* \* \*
>
> We think the controlling rule in the instant case is: If the insurer has exercised good faith in all of its dealings under its policy, if the settlement which it has rejected has been fully and fairly considered and has been based on an honest belief that the insurer could defeat the action or keep the judgment within the limits of the policy, and if its determination is based on a fair review of the evidence after reasonable diligence in ascertaining the facts, accompanied by com-

petent legal advice, a court will not subject the insurer to liability in excess of policy limits if it ultimately turns out that its determination is a mistaken one. 118 N.W.2d at 320–23.

■ The present case is an unusual one. Early in the investigation, State Farm had competent medical opinions that the insured, Lienemann, lacked sufficient capacity to control his vehicle at any time after he had been stricken. On this basis, an independent attorney advised State Farm on November 18, 1969, almost two years before trial, that there was a strong probability of obtaining a directed verdict or a jury verdict for the defense. On the strength of this opinion, State Farm refused to discuss settlement and remained adamant in its refusal to negotiate throughout the trial.

However, that attorney had cautioned State Farm in the same opinion letter that the situation might be altered if medical testimony supporting the plaintiffs' position came to light. Such adverse medical testimony did subsequently appear, and State Farm was clearly aware of it well before trial. In August 1970, 10 months before trial, the state court plaintiffs deposed Dr. McWhorter, named as a witness for the defense and upon whose earlier opinion State Farm's attorney had relied. Dr. McWhorter testified that he felt Lienemann had had a stroke and did not have control of his car. On direct examination, however, he injected substantial doubt regarding this opinion and stated:

A. Well, eight-tenths of a mile is quite a ways for a guy who is completely unconscious all the time to keep it on the highway after it has banged around in the ditch.

Q. So that if this car was on the pavement that eight-tenths of a mile,

would your opinion be then at some time during that period he would have a lucid interval?

A. Well, it would be, if you will allow me to say that in this period lucid could be in varying stages of this, which he might have had some control, might have had enough control to have steered the car, at least partially.

\* \* \* \* \* \*

A. Well, he could have become partially conscious—could have been conscious for a period and brought the car back out of the ditch and drove it down the road for a ways.

Q. And then lapsed into unconsciousness?

A. Yes.

Q. And that's as likely to have happened as the other, in fact it's more likely because of the distance involved?

A. *I would say in my opinion because of that being eight-tenths of a mile, yes.*

Q. If he had driven a quarter of a mile would your opinion be any different?

A. Oh, yes, I think it would be, I think it could be quite likely that an unconscious man, that a car could come out and go down the road a quarter of a mile, *but I don't think it sure could have much further than that and stayed on the road.*

(Emphasis added).[3]

On May 25, 1971, the Moats estates took the deposition of Dr. Gogela, a well-known Lincoln, Nebraska neurosurgeon. Dr. Gogela testified that:

A. I believe that this patient was in control of his faculties at the time to be able to drive that particular dis-

---

3. During the trial Dr. McWhorter actually supported plaintiff's theory of the case when he testified:

Q. What I'm getting at, and I'll rephrase, you said here, that an unconscious man cannot drive a car.
A. Yes.
Q. You know that this car was driven for a distance of 3,000 feet.

A. That's right.
Q. After it came out of the grader ditch?
A. Yes.
Q. That in itself in the fact itself in that he kept this car on the road that distance that would indicate a degree of consciousness, is that right?
A. Yes.

tance in a straight line, I believe that he would have to be.

\* \* \* \* \* \*

Q. Doctor, would you explain what you mean by "a straight line."

A. Maintaining an automobile in more or less normal fashion upon a highway, that's what I'm talking about.

Q. Are you assuming a two-lane highway, one in each direction, in other words?

A. Well, any kind of highway really.

Q. And, Doctor, would you explain the basis of your opinion.

A. I could could scarcely believe that a person who would be unconscious and complete loss of his faculties would be able to operate a motor vehicle straight way down a highway. I would hardly think that it would be possible, I would think that an unconscious person would tend to veer and go off the highway if he did not have control, if he did not, if he could not see what he was doing, if he could not coordinate his faculties and facilities to maintain an automobile on the highway. I think that, I say this both as a physician and with the knowledge that I believe I have of physiology and then just from simple logic.

Notwithstanding this adverse pre-trial testimony, State Farm remained adamant in its refusal to negotiate. Prior to trial, the State Farm claims supervisor left on vacation and sent a note concerning the case to his superior. It read:

> There will be another demand to pay our limits by the insured. I will be on vacation and undoubtedly there will be correspondence and phone calls coming from Deutsch [attorney for State Farm]. Just want you to be aware of the situation. We are trying all the way.

In light of these circumstances, we feel the record shows other than mere conflicting evidence on which the insurer mistakenly but in good faith, believed it would win at trial. *Cf. Hadenfeldt, supra; Olson, su-*

*pra.* Here, the original judgment *not to negotiate* was made when the investigation failed to disclose a *prima facie* case of negligence on the part of its insured. Yet when competent medical testimony adduced in part from the defense's own expert demonstrated the vulnerability of this original opinion, State Farm decided to "stonewall" it and to go all the way—win or lose.

The evidence discloses that State Farm decided not only to reject settlement but to refuse even to explore settlement *regardless* of the development of adverse evidence before and during trial. We think the jury was entitled to find that State Farm acted in bad faith and prejudiced the rights of its insured.

█ This is not to say that when the insurer is presented with conflicting evidence and carefully weighs the probabilities of success, it will be liable for bad faith where its judgment to stand firm is subsequently proven wrong. We note, however, that it is a rare tort case in which either party can in good faith totally ignore the development of adverse facts before and during the trial, and the changing probabilities to be weighed in negotiating a settlement. In all kinds of litigation, witnesses go sour, evidence previously thought admissible becomes inadmissible or vice versa, and the probabilities change with the trial court's rulings from day to day. Mere failure to weigh these factors properly is not bad faith. However, refusal even to consider them is another matter, especially when insurance counsel represents the interests of both insurer and insured.

We find sufficient evidence of bad faith and the district court properly submitted the case to the jury.

### III.

State Farm further contends that the trial court erred in instructing the jury that the insurer could be found liable if it was negligent in certain particulars. Although Nebraska law indicates that bad faith rather than mere negligence is the predicate for an insurer's excess judgment liability, the Nebraska standards of bad faith and negli-

gence are not clearly delineated. Thus, in *Olson*, the Nebraska Supreme Court observed:

> The question here is not whether [the insurer's] judgment was correct in analyzing the facts and the law of the case, but whether it acted honestly, *without negligence*, and in good faith.

118 N.W.2d at 321 (emphasis added).

In *Hadenfeldt, supra,* the Nebraska court emphasized that bad faith and not negligence was the appropriate standard. However, in doing so the court observed:

> While an insurer is obligated to use due care and reasonable diligence to ascertain the facts surrounding a claim and obtain competent legal advice concerning the claim, the ground for recovery in this state in this type of case is bad faith.
> . . . The evidence in this case showed the defendant used due care and diligence. The record did not establish negligence on the part of the defendant in the investigation or handling of the claims.

239 N.W.2d at 504.

 Thus, while bad faith is the basis of liability, the exercise of due care and diligence is nevertheless a material factor in determining bad faith.[4] Bad faith can be demonstrated under Nebraska law by an insurer's clearly unwarranted rejection of a settlement offer and complete failure to consider the potential liability of its insured for an excess judgment. *Hadenfeldt, supra.* One of the elements of bad faith is, of course, the failure to investigate the total claim properly.[5]

The record reveals evidence from which a jury could find that State Farm completely ignored the vulnerability of its evidence and the possibility that a jury would accept the medical testimony supporting the plaintiff's case in the state court suit.[6]

 State Farm also urges that the district court erred in submitting to the jury its alleged failure to investigate the accident completely, including the interviewing of witnesses and otherwise ascertaining all facts and circumstances bearing thereon. We need not discuss these factors in detail. We are satisfied that the jury was presented with the evidence on both sides of these issues and no prejudice arose from the instructions or the evidence presented.[7]

---

4. It is urged that the trial court's instruction allows the jury to base a finding of bad faith on any of the alleged acts of negligence, since the instruction uses the disjunctive "or". We disagree. This reading overlooks the prefatory language in Instruction No. 9 which states "To constitute 'bad faith', there must be something more than a mere showing of inadvertence or honest mistake of judgment." It is axiomatic that the instructions must be read as a whole.

5. In *Riske v. Truck Ins. Exchange,* 490 F.2d 1079 (8th Cir. 1974), this court construed Minnesota law which also requires a showing of "bad faith". The Riskes attempted to prove bad faith by showing that investigation, evaluation of the claim and consideration of the insured's interest had been inadequate. This court stated:

> It is undisputed that in order to evaluate the merits of an offer to settle one must be in possession of enough facts to make an accurate evaluation of the extent of injury.

490 F.2d at 1083.

6. The trial court instructed in part:

> On the issue of "bad faith", you should further consider the nature, seriousness, and strength of the claim of the Estate of Marvin Moats, the circumstances surrounding the accident and the cause thereof, the law governing the trial of the case of *Marvin Moats v. John B. Lienemann*, the results of the litigation over the accident, the reasonableness of the proposed settlement under the circumstances then existing, the communication by State Farm to the Estate of John B. Lienemann of compromise offers to settle prior to trial, the extent of the risk assumed by State Farm Fire and Casualty Company and by its insured, John B. Lienemann, by State Farm's rejection of the proposed settlement, the reasonableness of State Farm's action in rejecting such proposed settlement, the advice of State Farm's attorneys and adjusters, and all other facts and circumstances in evidence.

7. This court, in considering objections to the instructions, is confined to the error raised before the trial court. *See* Fed.R.Civ.P. 51. The only challenge to Instruction No. 9 raised is found in the transcript where State Farm's attorney stated:

MR. SIMMONS:

. . . . .

Now as to Instruction Number 9 on Page 1 of that instruction at Line 18, on instructing

*Lienemann Cross-Appeal.*

We come now to the cross-appeal. Plaintiff asserts that the trial court erred in directing a verdict on plaintiff's suit for the $7,500 paid to Mrs. Moats' estate under the consent judgment.

After the verdict against the Lienemann estate for the wrongful death of Mr. Moats, State Farm offered its policy limits, $20,000, in the settlement of the claim of Mrs. Moats' estate. The Lienemann estate offered an additional $7,500. The Moats estate accepted the offer and a consent judgment was entered for $27,500. The Lienemann estate urges that State Farm's bad faith refusal to settle the claim of Mr. Moats' estate affected the handling of the claim of Mrs. Moats' estate as well. Therefore, the Lienemann estate contends that its payment of $7,500 on the latter claim, made *after* liability had been established on the trial of the first claim, should be recoverable in this suit.

The directed verdict on this claim was grounded on the district court's view that since State Farm offered and paid its policy limits of $20,000 in settlement of the second claim, its action could not be held to constitute bad faith refusal to settle. State Farm urges as well that before and during trial the Lienemann estate was willing to settle both claims for $7,500 over and above the policy limits, and therefore any recovery for the $7,500 would become a "windfall". *Cf. National Farmers Union Property & Casu-*

*alty Co. v. O'Daniel,* 329 F.2d 60, 67 (9th Cir. 1964).

The issue is not without difficulty.

One problem with the "windfall" theory, *i. e.,* that the plaintiffs *voluntarily* made the contribution to the final settlement, is that the offer was originally made for the settlement of *both* claims before the estate's liability had been litigated. Under Nebraska law, once Mr. Lienemann's fault for Mr. Moats' death was adjudicated, the estate's liability for Mrs. Moats' death would also attach. *See Hickman v. Southwest Dairy Suppliers, Inc.,* 194 Neb. 17, 230 N.W.2d 99, 103–04 (1975). The Lienemann estate argues that once liability had been determined against it, payment of the $7,500 was in effect coerced, and in view of the bad faith adjudication against State Farm, the Lienemann estate should not be able to recoup the $7,500. An additional factor supporting this claim is State Farm's total failure, before the state court verdict, even to negotiate with the claimant estates. It can be argued that if negotiation had been timely pursued, a settlement of *both* claims might have been achieved within the policy limits. Therefore, it is argued, State Farm's bad faith caused the loss of the $7,500 as well as the excess judgment in the litigated claim. Viewed in this light, it can be argued that the Lienemann estate's compromise of its excess liability at the time it did is in the nature of mitigating further damages brought about at least in part by the prior bad faith conduct of State Farm.[8]

---

on the law one of the items mentioned is the failure by State Farm to exercise due care in completely investigating the Lienemann-Moats accident including the interviewing of witnesses and otherwise ascertaining all facts and circumstances bearing thereon and I question whether there has been any evidence at all or our position is that there is no evidence at all to show or to support that statement.

THE COURT: There is evidence that they did not take the statement of Mrs. Moats or depose her.

MR. GATZ: Or Mrs. Gray.

THE COURT: Mrs. Gray, and they say that she said, "My statement would be the same as my husband's."

MR. SIMMONS: Yes.

THE COURT: But they did not depose her or serve interrogatories or anything else on opposing counsel as to what she would say.

MR. SIMMONS: But whether that is sufficient to constitute failure to exercise due care, I do not know.

THE COURT: Yes, but you see that is a jury question.

MR. SIMMONS: Yes, I see, but I am raising the question.

Transcript at 209–10.

8. Restatement of Torts, § 919 states:

*Harm Suffered and Expenditures Made In Efforts to Avert Harm.*

(1) A person whose legally protected interests have been endangered by the tortious conduct of another is entitled to recover for expenditures reasonably made or harm suf-

Notwithstanding the persuasiveness of this reasoning, we affirm the trial court's exclusion of the $7,500 claim. The burden of proof remained on the plaintiff to show its damage to a reasonable certainty. The evidence shows that the wrongful death plaintiffs never offered to accept less than $47,500, so that at all times an overall contribution of $7,500 from the estate was required. Thus, we are not faced with a claim which could have been settled within the policy limits before trial. If this were the case, then we think the principle of the Restatement of Torts, § 919 would apply.

Under the circumstances, we agree with the trial court's directed verdict, on the basis that plaintiff has failed to prove any damages flowing from the consent judgment.

The Lienemann estate also appeals from the district court's refusal to award attorney fees and prejudgment interest. The claim for attorney fees is based on Neb.Rev.Stat. § 44–359 which provides:

*Policies; actions; attorney's fees.* In all cases where the beneficiary, or other person entitled thereto, *brings an action upon any type of insurance policy . . against any company, . . . the* court, upon rendering judgment against such company, . . . shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his recovery, to be taxed as part of the costs.

. . .

Neb.Rev.Stat. § 44–359 (1943) (emphasis added).

State Farm contends that excess judgment suits arise in tort rather than contract and are not within the statute. Plaintiff argues that this action is upon the insurance contract, in reliance on *Olson* which said:

In the event the insurer elects to resist a claim of liability, or to effect a settlement thereof on such terms as it can get, *there arises an implied agreement that it will exercise due care and good faith where the rights of an insured are concerned.* Olson v. Union Fire Ins. Co., 174 Neb. 375, 118 N.W.2d at 321 (emphasis added). *See also Hilker v. Western Automobile Ins. Co.,* 204 Wis. 1, 235 N.W. 413, 415 (1931).

We construe this to mean that the duty to exercise good faith arises out of the contractual relationship, but that the liability for bad faith nonetheless remains a tortious wrong. There is no covenant in the policy which promises coverage above the policy limits. The wrong is clearly a tortious wrong, and therefore the suit is not upon the policy itself within the meaning of Neb. Rev.Stat. § 44–359. It has generally been held that excess judgment actions arise in tort rather than in contract. *See* 14 G. Couch, Cyclopedia of Ins. Law 2d § 51:22 (1965); Keeton, *Liability Insurance and Responsibility for Settlement,* 67 Harv.L.Rev. 1136 (1954). *Cf. Kleinschmit v. Farmers Mutual Hail Ins. Ass'n of Iowa,* 101 F.2d 987, 989 (8th Cir. 1939) (dictum) (Nebraska law). Moreover, this court gives "great weight" to the interpretation of state law reached by a trial judge familiar with local law. *See Sherrill v. Royal Industries, Inc.,* 526 F.2d 507, 510 (8th Cir. 1975). We find no error in the trial court's ruling.

The Lienemann estate also appeals from the denial of interest from the date it paid the excess judgment. This claim is based on Neb.Rev.Stat. § 45–104, which provides:

*Interest; other contract obligations.* On Monday due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment, interest shall be allowed at the rate of six per cent per annum. Unsettled

fered in a reasonable effort to avert the harm threatened.

(2) A person who has already suffered injury by the tort of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert further harm.

Restatement of Torts, § 919 (1939).

accounts between parties shall bear interest after six months from the date of the last item thereof.

Neb.Rev.Stat. § 45–104 (1943).

We are satisfied that the statute is inapplicable because, as we have discussed, the action lies in tort rather than in contract.

■ The Nebraska rule regarding the propriety of awarding prejudgment interest on a tort claim was set forth in *Nat'l Fire Ins. Co. v. Evertson*, 157 Neb. 540, 60 N.W.2d 638 (1953). Under the announced rule where there exists a reasonable controversy affecting the subject of the litigation Nebraska law requires that interest "may be had only from the date of the determination of the right of recovery and the ascertainment of the amount." 157 Neb. at 543, 60 N.W.2d at 639.

■ Applying that rule to the instant case, we cannot say that State Farm's liability for the excess judgment was not the subject of reasonable controversy even though the exact damages were ascertainable. *See also Riley v. Nat'l Auto Ins. Co.*, 162 Neb. 658, 77 N.W.2d 241 (1956).[9] We find the district court correct in denying plaintiff's claim for prejudgment interest.

The cross-appeal is denied and the judgment of the trial court is affirmed.

BRIGHT, Circuit Judge (dissenting).

I respectfully dissent. In my view the undisputed medical testimony that Mr. Lienemann suffered a massive stroke shortly before the fatal collision at minimum constituted substantial evidence of a reasonable and probable theory of nonliability. *Olson v. Union Fire Ins. Co.*, 174 Neb. 375, 118 N.W.2d 318, 323 (1962).

9. We, of course, must follow Nebraska law in this determination. The issue is not without difficulty, since *the amount* of damage at the time of the insured's payment, i. e. $26,037.12, was ascertainable and not in controversy. Under some Nebraska case law this would appear to meet the test of a liquidated sum. *See e. g., Mintken v. Nebr. Surety Co.*, 187 Neb. 215, 188 N.W.2d 819 (1971); *Missouri, K. & T. Trust Co. v. Clark*, 60 Neb. 406, 83 N.W. 202 (1900). However, the *Evertson* and *Riley* cases seem to stress that where *the subject* of the litigation is in reasonable controversy the Nebraska rule is that prejudgment interest will not be allowed. This rule has been criticized because most litigated liquidated damage claims where prejudgment interest is recognized lend themselves to bona fide controversies. *See* D. Dobbs, *Remedies* 167 (1973). Nevertheless, in the absence of any more definitive decision we cannot say the district court erred in denying prejudgment interest in the present controversy.