CERTAIN UNDERWRITERS OF LLOYD'S and Companies Subscribing to Excess Aviation Liability Insurance Policy No. FL–10959 A & B, Plaintiffs,

v.

GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, Defendant.

No. IP85–1828–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 18, 1988.

Mark Dombroff, Edward Griffith, Hughes Hubbard & Reed, Washington, D.C., Thomas L. Davis, Locke Reynolds Boyd & Weisell, Indianapolis, Ind., for plaintiffs.

Glenn E. Davis, Sr., Davis Davis & Langan, Indianapolis, Ind., for defendant.

McKINNEY, District Judge.

This matter came before the Court on a motion for partial summary judgment in which plaintiffs contended that, as a matter of law, defendant's affirmative defenses were inapplicable to this cause. After considering the parties' arguments and the accompanying evidence, this Court granted plaintiffs' motion on February 19, 1988. The Court now enters its memorandum in support of that ruling. In addition, because plaintiffs' motions in limine were closely related to their motion for partial summary judgment, the Court addresses the motions in limine in this memorandum as well.

## MEMORANDUM

### I. BACKGROUND

The facts of this case which appear in the pleadings and the documentary evidence are:

At all times relevant to the case at bar, Certain Underwriters of Lloyd's (plaintiff "Underwriters") and General Accident Insurance Co. (defendant "General Accident") each insured C.F.E. Air Cargo, Inc., ("CFE" or "the insured") for liabilities arising out of CFE's operations at airports. During the effective policy period, Mr. Lee Draper slipped and fell on certain property at the Indianapolis Airport which was controlled and occupied by CFE.[1]

In 1983, Draper and his wife filed an action in state court against the Indianapolis Airport Authority, Kenworthy Air Freight Service, and CFE, claiming one or all of them were liable for the injuries Draper suffered when he fell. General Accident retained counsel to defend CFE in the Draper litigation. Underwriters, considering itself an excess insurer, took no action on behalf of CFE; but in October, 1983, before the Draper trial, Underwriters' lawyers (Bigham, Englar, Jones & Houston) wrote to General Accident requesting copies of the Draper pleadings and other relevant documents, and further requesting to be kept apprised of the progress of the litigation. In May, 1984, Underwriters' lawyers again wrote to General Accident, stating that they had not received the requested information and repeating the request. Shortly thereafter, the counsel retained by General Accident to defend CFE sent some materials to Underwriters' lawyers, along with a letter summarizing the status of the action. That letter indicated that Kenworthy Air

---

1. There is some dispute as to whether Underwriters knew that CFE controlled the property in question. The Indianapolis Airport Authority owned the property, and was leasing it to Kenworthy Air Freight Services, Inc. Kenworthy was allowing CFE to use the property (*See* Ex. C, ¶ 2, General Accident's Response to Motion for Partial Summary Judgment).

Freight, Inc. was leasing the subject property from the Indianapolis Airport Authority, but did not inform Underwriters that the property was under CFE's control at the time of the accident.

Early on in the litigation Kenworthy Air Freight settled with the Drapers. Underwriters did not know Kenworthy had settled. In addition, in April, 1984, the Indianapolis Airport Authority filed a third party complaint against General Accident, Underwriters and others seeking indemnification for any amounts recovered by the Drapers. In June, 1984, Underwriters wrote to the Authority, confirming that Underwriters had an excess insurance policy covering CFE in force on the date of Draper's accident, and acknowledging the Authority as an additional insured. The Authority then dropped its suit against Underwriters.[2]

No further communication occurred between General Accident, Underwriters, and the parties to the Draper action until April, 1985, in the midst of trial. At that time, the Claims Manager from General Accident called Underwriters' lawyers and told them that Kenworthy had settled with the Drapers, and that the Drapers' claim against CFE would be going to the jury the next day. Underwriters' lawyers immediately demanded that General Accident attempt to settle the case by tendering its (General Accident's) policy limit of $300,000. Underwriters followed up the oral demand by telex. General Accident did not tender its policy limits, the case went to the jury, and the jury awarded the Drapers more than $800,000. A post-trial settlement in which both insurance companies participated reduced the judgment to $650,000; General Accident paid $318,000 and Underwriters paid $332,000. (In this Court's original Entry, the amounts each party paid toward the Draper settlement were transposed. The transposition was corrected in the entry for release to the legal data bases.)

Underwriters then commenced the instant action, claiming that General Acci-

dent had exposed Underwriters to a liability it would not have incurred but for General Accident's wrongful failure to settle the Draper claim. In response, General Accident asserted several affirmative defenses: laches, estoppel, contributory negligence, comparative fault and incurred risk. Underwriters now moves for partial summary judgment, asking the Court to reject the affirmative defenses as a matter of law.

In opposition to the motion for partial summary judgment, General Accident maintains there are genuine issues of material fact not only as to Underwriters' duties regarding the Draper litigation, but also as to the extent of Underwriters' coverage. Specifically, General Accident challenges Underwriters' contention that Underwriters' insurance coverage of CFE was excess coverage only.

## II. STANDARD FOR PARTIAL SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56 and the related case law, this Court must first determine whether there is any genuine issue as to the extent of Underwriters' insurance policy covering CFE. If the extent of coverage is unclear, summary judgment is improper, because the rights and duties of the parties *inter se* turn on whether Underwriters was an excess or a primary carrier.

If there is no genuine issue as to the extent of coverage, this Court must then determine whether Underwriters is correct in contending that General Accident's affirmative defenses are inapplicable to this cause as a matter of law. General Accident has the burden of proof on its affirmative defenses, and once Underwriters places the matter at issue, a complete failure of proof on any essential element of the defenses warrants the imposition of a partial summary judgment. *Howard v. Green*, 555 F.2d 178, 181 (8th Cir.1977) (Burden of proof is on party asserting affirmative defense); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91

---

**2.** This Court assumes General Accident similarly acknowledged coverage, but the parties have presented no evidence on that point.

L.Ed.2d 265 (1986) (Summary judgment should be granted when moving party demonstrates that non-moving party's evidence is insufficient on an essential element of the latter's claim); *see generally* Fed.R. Civ.P. 56(a). To prevail, General Accident must establish that Underwriters had some duty to the Draper litigation, and that there are genuine issues of fact as to whether Underwriters fulfilled that duty.

## III. EXTENT OF UNDERWRITERS' COVERAGE

General Accident offers three separate arguments in an attempt to establish a genuine issue as to the extent of Underwriters' insurance policies: (1) the certificate of coverage describing CFE's insurance does not expressly show that Underwriters carried only excess insurance for CFE; (2) the certificate of coverage provides that the stated insurance is "subject to the usual printed clauses and conditions", thus the extent of coverage is not defined; and (3) General Accident is entitled to an inference that Underwriters issued insurance to CFE other than excess insurance. These arguments are unavailing, for they are thoroughly refuted by the evidence.

### A. *Certificate of Coverage*

■ General Accident correctly notes that the certificate of coverage does not identify Underwriters' policy as excess coverage (Ex. A, Defendant's Response to Motion for Partial Summary Judgment, also appearing as Ex. 1, Iacovelli Declaration). However, even a cursory reading of the certificate supports the inference that the policy covered only those losses which exceeded CFE's primary insurance policy limits. The certificate lists the relevant sum insured as the *"Difference between* Comprehensive General Liabilities [e.g., General Accident's coverage] and Contractual Liability [e.g., Underwriters' coverage]" (Ex. A, emphasis added).

In addition to the ready inference from the face of the certificate, Underwriters has provided separate proof of the extent of its coverage. First, Underwriters submitted the declaration [3] of Michael Iacovelli, the insurance broker who placed the CFE policy. Iacovelli stated that the policy provided *excess* liability coverage for the Drapers' claim (Iacovelli Dec. ¶ 3, emphasis added). General Accident offers nothing to rebut Iacovelli's statement. In addition, Underwriters points out that the certificate of insurance (not to be confused with the certificate of coverage) unequivocally lists Underwriters' policy No. FL–10959 A & B, the policy at issue here, as excess liability insurance (Ex. C, Defendant's Response to Motion for Partial Summary Judgment).

### B. *"Usual Printed Clauses" Proviso*

■ General Accident maintains that the extent of coverage remains at issue because the certificate of coverage makes the insurance subject to the "usual printed clauses and conditions" and those "conditions" do not appear on the certificate. However, broker Iacovelli explained that the proviso refers to standard, published insurance forms (Iacovelli Supp. Dec. ¶ 2). The forms are made a part of the evidence in the instant case in Attachment B to Iacovelli's Supplemental Declaration; they describe only standard exclusions and conditions, bearing no relationship to the determination of the excess nature of Underwriters' coverage.

### C. *Inference that Underwriters Issued Other Insurance to CFE*

General Accident insists that summary judgment is inappropriate, arguing that there is no proof that Underwriters did not issue other insurance to CFE in addition to the excess policy. The argument is not persuasive. General Accident is entitled to reasonable inferences in its favor, but once Underwriters supports its motion with documentary evidence, the burden of production shifts to General Accident to set forth

---

**3.** Underwriters' evidence is in the form of properly subscribed declarations, as opposed to affidavits. *See* 28 U.S.C. § 1746.

specific facts showing that there is a genuine issue as to the extent of coverage. Fed.R.Civ.P. 56(e). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). There being no indication in the record of an additional insurance agreement between Underwriters and CFE, this Court finds that Underwriters was the excess insurance carrier and that General Accident was the primary carrier with respect to the claims asserted against CFE by the Drapers.

## IV. THE RIGHTS AND DUTIES OF EXCESS INSURANCE CARRIERS

The parties agree that Indiana law controls this diversity case. The Indiana courts, however, have not directly addressed the issue presented in this motion, i.e., the applicability of the enumerated affirmative defenses in a subrogation action by an excess carrier against a primary carrier for wrongful failure to settle. Nor have the Indiana courts analyzed the respective rights and duties running between insureds, primary carriers and excess carriers. Consequently, this Court must determine how an Indiana court would assign the relevant rights and duties to resolve the issue at bar. *See Bowen v. U.S.*, 570 F.2d 1311, 1322 (7th Cir.1978); *Dabney v. Montgomery Ward & Co., Inc.*, 761 F.2d 494, 499 (8th Cir.1985).

Indiana courts look to the national trends for guidance on insurance issues of broad application such as the one at bar. *See, e.g. Bennett v. Slater*, 154 Ind.App. 67, 289 N.E.2d 144 (1972) (Court used Colorado, Missouri, Texas and Delaware law to decide an insurance law question). Accordingly, this Court proceeds to review the national trends regarding the rights and duties of excess insurance carriers as against primary carriers.

### A. *The Doctrine of Equitable Subrogation*

1. Duty of Primary Insurers to Insureds

Indiana, like nearly every other state, imposes a duty on primary insurers to exercise good faith in their attempts to settle suits against their insureds. *Bennett v. Slater*, 154 Ind.App. 67, 289 N.E.2d 144, 146 (1972); *Anderson v. St. Paul Mercury Indemnity Co.*, 340 F.2d 406, 408 (7th Cir. 1965) (applying Indiana law); *see generally* Annotation, *Duty of Liability Insurer to Settle or Compromise*, 40 A.L.R.2d 168 (1955). The duty is designed to balance the conflict of interests between the insured and the primary insurer. For example, when a person files a claim against the insured seeking $500,000, and the insured's policy limit is $100,000, the insured risks becoming personally liable for any judgment which exceeds $100,000. A rational insured, having purchased protection against liability, would seek to settle the action for an amount close to the policy limit, to minimize the risk of personal liability. Typically, however, the insured has little or no settlement leverage, because liability insurance policies ordinarily give the insurer full control over the defense of the insured, including settlement decisions. Absent the duty to settle, the insurer in the example above, when deciding whether to go to trial or to settle, would consider only its policy limit, i.e., $100,000—ignoring the risk of an excess verdict, which would be borne by the insured. *See* Annot., 40 A.L. R.2d 168, 170. In recognition of this conflict of interests, the settlement duty requires primary insurers "to view the situation as if there were no policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured." *Continental Casualty Co. v. Reserve Insurance Co.*, 307 Minn. 5, 238 N.W.2d 862 (1976). On payment of a premium the insured has the right to exact this duty of settlement from the primary carrier.

While acceptance of a general settlement duty is widespread, the nature of the duty differs from jurisdiction to jurisdiction. Some courts have held primary insurers liable only if the insured can demonstrate the insurer's bad faith in conducting settlement negotiations. *See, e.g., U.S. Fire Insurance Co. v. Royal Insurance Co.*, 759 F.2d 306, 309 (3d Cir.1985) (applying Penn-

sylvania law). Other courts, though, have held that the duty to settle is measured by a reasonableness standard: "an insured [may] recover the entire judgment where the insurer's negligent failure to accept a settlement offer causes a judgment in excess of policy limits to be entered against the insured". *Green v. J.C. Penney Auto Insurance Co.*, 806 F.2d 759, 764 (7th Cir. 1986) (applying Illinois law); *cf. Steele v. Hartford Fire Insurance Co.*, 788 F.2d 441, 447 (7th Cir.1986). Three courts have interpreted Indiana law on this issue, and each one indicated that negligence in settlement negotiations is actionable in Indiana. *Bennett v. Slater*, 154 Ind.App. 67, 81, 289 N.E.2d 144, 146 (1972); *Anderson v. St. Paul Mercury Indemnity Co.*, 340 F.2d 406, 408 (7th Cir.1965); *Kingan & Co. v. Maryland Casualty Co.*, 65 Ind.App. 301, 312, 115 N.E. 348 (1917).[4]

### 2. Primary Insurer's duty to Excess Insurer

Recognition of the insurer's duty to exercise reasonable concern for the interests of the insured when conducting settlement negotiations does not end the matter. The obvious next problem, as the case at bar demonstrates, is the transferability of the rights of an insured who has purchased excess liability protection. In this scenario, it is no longer the interests of the insured, but those of the excess carrier that are in conflict with the interests of the primary carrier. To require or even to allow an insured who carries excess insurance to sue the primary carrier for wrongful failure to settle while the excess carrier waits in the wings would be to disregard the real party in interest. Accordingly, the majority of jurisdictions addressing the question have allowed excess insurers to sue in their own stead through the doctrine of equitable subrogation. *See* Annotation, *Excess Carrier's Right to Maintain Action Against Primary Liability Insurer for Wrongful Failure to Settle Claim Against Insured,* 10 A.L.R. 4th 879 (1981).*

Since the time the first court[5] recognized an action by an excess insurer, courts and commentators have offered well developed theories and rationales for allowing excess insurers to be subrogated to the rights of their insureds for wrongful failure to settle. The Minnesota Supreme Court, in *Continental Casualty Co. v. Reserve Insurance Co.*, 307 Minn. 5, 238 N.W.2d 862, 864 (1976), succinctly described the concept and its purpose: "If the insured purchases excess coverage, he in effect substitutes an excess insurer for himself. It follows that the excess insurer should assume the rights as well as the obligations of the insured." 238 N.W.2d at 864. The Ninth Circuit, in *Valentine v. Aetna Insurance Co.*, 564 F.2d 292 (9th Cir.1977) relied on Minnesota's common sense approach. In *Valentine*, the primary carrier argued that the result of subrogation would be an avalanche of actions by excess carriers, leading to higher settlements and to burgeoning insurance costs. The *Valentine* court rejected the primary carrier's arguments and recognized the subrogation action.

Another California decision offers further insight into the subrogation concept: "Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary the insured himself could have asserted." *Commercial Union Assurance Co. v. Safeway Stores*, 26 Cal.3d 912, 164 Cal. Rptr. 709, 610 P.2d 1038, at 1041 (1980). Thus, the rationale for subrogation is founded on the same conflict of interest

4. Courts have cautioned prospective plaintiff-insureds, however, that liability for negligence is not liability for mistaken judgment. The insurance company is not "an insurer against the uncertainties inherent in the settlement process" and is not liable for a reasonable litigation decision which goes awry. *See, e.g., Steele v. Hartford Fire Insurance Co.,* 788 F.2d 441, 447 (7th Cir.1986) (applying Illinois law), *Commercial Union Insurance Co. v. Liberty Mutual Insurance Co.,* 426 Mich. 127, 393 N.W.2d 161, 163 (1986).

5. *See American Fidelity and Casualty Co. v. All American Bus Lines,* 190 F.2d 234 (10th Cir. 1951).

that supports the primary carrier's settlement duty to the insured.

In addition, there is a functional rationale for subrogation: the two types of insurance (primary and excess) have divergent purposes, and that divergence warrants recognition of the excess carrier's right to subrogation. In *Puritan Insurance Co. v. Canadian Universal Insurance Co.*, 775 F.2d 76 (3d Cir.1985), the court described the divergence as follows:

"The obligations of the carriers to the insured are somewhat different. Because it had a duty to defend the insured and on average most claims are within its limits, the primary carrier charges a larger premium for an equivalent amount of coverage. In addition, the primary's policy generally gives it the right to decide when a claim shall be settled or tried.

Because of its less frequent exposure, the excess carrier generally charges lower premiums. Its obligation does not arise until primary limits are exhausted, and to some extent the excess carrier is at a disadvantage in dealing with a tight-fisted and overly optimistic primary carrier, which has greater control over settlement." *Id.* at 79.

Equitable subrogation, then, recognizes the essential disparity in coverage and control between excess and primary carriers. By constraining "overly optimistic" primary carriers to consider the interests of risk-averse excess carriers in the same fashion as they consider the interests of the insured, subrogation prevents primary carriers from inordinately shifting mutual risks and losses to excess carriers. *See* Lanzone & Ringel, *Duties of a Primary Insurer to an Excess Insurer*, 61 Neb.L. Rev. 259, 267 (1982).

Only one jurisdiction has rejected the subrogation doctrine. In *Rocky Mountain Fire & Casualty Co. v. Dairyland Insurance Co.*, 452 F.2d 603 (9th Cir.1971), the court held that Arizona law does not allow an excess carrier to recover as subrogee against the primary carrier. The *Rocky Mountain* court based its opinion on the Arizona Supreme Court's ruling in *Univer-*

*sal Underwriters Insurance Co. v. Dairyland Mutual Insurance Co.*, 102 Ariz. 518, 433 P.2d 966 (1967). In *Dairyland,* the excess carrier settled an action against its insured after the primary carrier refused to defend. The settlement amount exceeded the primary policy limit, and the excess carrier sued the primary for the entire settlement amount. The court refused to award the excess carrier the amount over the primary limits, reasoning, "There is no privy [sic] of contract between these two insurance companies nor is there any principle of law of which we are aware that would give [the excess carrier] such a windfall because of [the primary carrier's] mistreatment of its assured." 433 P.2d at 968.

■ Application of the *Dairyland* holding to subrogation cases is now outmoded. Privity of contract is no longer required in most tort actions. *See Northwestern Mutual Insurance Co. v. Farmers Insurance Group*, 76 Cal.App.3d 1031, 1050, 143 Cal. Rptr. 415, 426 (1978) (contractual relationship not required in excess carrier's action against primary carrier). Moreover, an excess carrier's recovery of funds paid to satisfy an excess verdict, as opposed to the *Dairyland* situation of funds paid in a settlement negotiated by the excess carrier itself, is hardly a "windfall" if the liability is a direct result of the primary carrier's bad faith or negligence in conducting settlement negotiations. Accordingly, this Court finds that the Indiana courts, when presented with this issue, will adopt the majority rule that an excess insurance carrier is subrogated to the rights and obligations of its insured as against a primary insurance carrier in an action for wrongful failure to settle.

### 3. Duty of Excess Carrier to Primary Carrier

■ Under the traditional concept of equitable subrogation, in which the subrogee (here, the excess carrier) stands in the shoes of the subrogor (the insured), the only defenses available to a defendant sued by the subrogee are those that could have been asserted against the subrogor. Some courts have applied this straightforward

approach to excess carriers' subrogation actions and have limited the primary carriers' defenses to those which would have been available against the insured. *See, e.g., Puritan Insurance Co. v. Canadian Universal Insurance Co.*, 775 F.2d 76, 80 (3d Cir.1985) (applying Pennsylvania law).

Other courts, along with commentators, have rejected any simple transfer of duties and defenses, voicing concern for the excess insurer, who could be precluded from recovery by the insured's non-cooperation with the primary carrier. *See Transit Casualty Co. v. Spink Corp.*, 94 Cal.App.3d 124, 156 Cal.Rptr. 360 (1979); *see also* Gallagher & German, *Resolution of Settlement Conflicts Among Insureds, Primary Insurers and Excess Insurers*, 61 Neb.L. Rev. 284, 357 (1982). To avoid that result, some courts have adopted the "triangular reciprocity" approach, which imposes a duty of reasonable care on each party, the insured, the primary carrier, and the excess carrier, vis-a-vis the other parties. *See Spink*, 156 Cal.Rptr. 360 (1979). Under triangular reciprocity, improper conduct by an insured will not bar an excess carrier's claim for wrongful failure to settle.

Triangular reciprocity has not been widely accepted, and this Court cannot justifiably hold that Indiana would adopt such an unconventional rule. Rather, this Court finds Indiana would follow the intermediate approach outlined by the Michigan Supreme Court in *Commercial Union Insurance Co. v. Medical Protective Co.*, 426 Mich. 109, 393 N.W.2d 479 (1986). *Medical Protective* identifies three tenets for subrogation cases: (1) an excess carrier has no greater or lesser rights than those of the insured (393 N.W.2d at 483); (2) an insured's breach of the obligations owed to the primary carrier can defeat the subrogation claim of the excess carrier (*Id.* 393 N.W.2d at 484, rejecting triangular reciprocity); and, significantly, (3) active participation by the excess carrier in settle-

ment negotiations may estop the excess carrier from recovery (Id. 393 N.W.2d at 486). In addition, an obvious corollary to the first tenet, which this Court will apply in this case, is that the excess carrier owes no greater or lesser duty to the primary than does the insured.

Under these tenets, the framework for the analysis of the instant motion is apparent. This Court must determine whether the duty General Accident attempts to ascribe to Underwriters flows out of any duty CFE, the insured, owed to General Accident, or, alternatively, whether Underwriters by actively participating in settlement negotiations assumed such a duty. Absent some duty, the affirmative defenses General Accident asserts must fail.

### a. *Contributory negligence/comparative fault*

■ Duty is an essential element of contributory negligence. *Clem v. United States*, 601 F.Supp. 835, 840–43 (N.D.Ind. 1985); *see Bridgewater v. Economy Engineering Co.*, 486 N.E.2d 484, 489 (Ind. 1985). Thus, in order to withstand summary judgment on the contributory negligence defense, General Accident must show either that CFE had a duty to actively participate in the settlement negotiations or that Underwriters independently assumed such a duty. General Accident has not made the requisite proofs.

CFE had no duty to settle or to compromise with the Drapers, the claimants in the underlying case. As the Court noted in *Lienemann v. State Farm Mutual Auto Fire & Casualty Co.*, 540 F.2d 333 (8th Cir.1976), "[w]hile an insured may compromise his possible liability over and above the limits of the insurance policy, he has no duty even to attempt to do so." [6] *Id.* at 336 (applying Nebraska law, citations omitted). *See* generally 7C Appleman *Insurance Law & Practice* § 4711 (1979). The duty to settle rests solely on the primary carrier.

---

6. The Lienemann court went on to hold that even where the insured does become involved in settlement negotiations, he is not estopped from suing his insurer for wrongful failure to settle. That aspect of *Lienemann* is inapplicable to the instant case. As previously noted, under the

*Medical Protective* tenets, an excess insurer may be estopped from recovery. 393 N.W.2d at 486. In this Court's view, if an excess insurer assumes an integral role in the settlement negotiations it is appropriate to hold that insurer responsible for the results of the settlement.

Similarly, Underwriters had no duty to investigate settlement options. An excess carrier owes no duty to the insured nor to the primary carrier either to defend the insured or to enter into settlement negotiations. *Vencill v. Continental Causalty Co.*, 433 F.Supp. 1371, 1378 (S.D.W.Va. 1977) (applying West Virginia law); *Continental Casualty Co. v. U.S. Fidelity & Guaranty Co.*, 516 F.Supp. 384, 393 (N.D. Cal.1981) (applying California law). As one commentator emphasized:

> "Excess insurance is routinely written in the insurance industry with the expectation that the primary insurer will conduct all of the investigation, negotiation and defense of claims until its limits are exhausted ... Thus, the primary insurer acts as a sort of deductible and the excess insurer does not expect to be called upon to assist in these details. The duty of the primary insurer is not divisible or limited to those suits that are within the policy limits and the insuring agreement creates a duty to defend any suit regardless of the amount claimed against the insured and the excess insurer is a third party beneficiary of that agreement."
> 7C Appleman *Insurance Law and Practice*, § 4682 (1979).

A brief summary of the rights and duties of the parties is useful at this point. Underwriters (the excess carrier) had no duty as a matter of law to hire lawyers to monitor its interests, just as CFE (the insured) had no corresponding duty. CFE did have a duty to cooperate with General Accident (the primary carrier) by providing information necessary to the defense of the action, and Underwriters had the same duty to the extent it had any relevant information. Reciprocally, General Accident had the duty to keep CFE and Underwriters informed about the progress of the litigation. General Accident had no right to expect Underwriters to participate in the litigation unless Underwriters had some exclusive information necessary to the defense. The fact that the insured can afford excess coverage should not result in gratuitous benefits or assistance from the insured through the excess to the primary carrier. The excess carrier consequently has no duty to participate in the defense, and any evidence of the excess's activities other than proof of out and out settlement negotiations is irrelevant in subrogation actions, excess carrier against primary carrier.

General Accident claims Underwriters assumed a duty to protect its excess interests in the Draper action by hiring lawyers to monitor the litigation. In addition, General Accident asserts a comparative fault non-party defense, alleging that the proximate cause of Underwriters' losses was Underwriters' lawyers' failure to keep Underwriters informed of the progress of the Draper action and their failure

> "to reasonable [sic] and timely correspond and/or consult with the lawyers representing Draper, defendant CFE, and all other defendants [in the Draper action] in order to allow [Underwriters] and their attorneys to make their own separate evaluation of the Draper claims and to make [Underwriters'] evaluation known to General Accident for its consideration in settlement negotiations with Draper." (Amended Answer of General Accident, ¶ 2.)

Unless Underwriters' lawyers assumed the otherwise non-existent duty to participate in settlement negotiations, the comparative fault defense must fail.[7] Hiring a lawyer in and of itself certainly cannot be considered active participation in settlement negotiations. So long as General Accident maintained sole authority to approve settlement offers and to set litigation strat-

---

7. Comparative fault embodies the concept and standards of negligence, i.e., duty. *See* Definitions, Indiana Comparative Fault Act, Ind. Code Ann. § 34–4–33–2 (West 1987 Supp.). Without some duty to act in a certain manner there is no negligence in this action, hence no cognizable fault within the parameters of the Comparative Fault Act. Comparative fault also includes incurred risk. *Id.* General Accident's incurred risk argument fails for the same reason the other defenses fail: Underwriters had no duty to participate in the litigation nor did it assume such a duty. Underwriters cannot be said to have voluntarily assumed the risk of an excess verdict when it rightfully expected General Accident to exercise reasonable care in attempting to settle the Draper action within the primary policy limits.

egy (an inference General Accident does not contest), Underwriters' lawyers could not participate in the action in any meaningful way. As this opinion has repeatedly stressed, to expect Underwriters' lawyers to participate in settlement negotiations before the primary policy limits were exhausted would be to alter the essential nature of the excess insurance contract. Just as an insured is not estopped from recovering against a primary carrier for bad faith failure to settle by hiring a personal attorney to appear at trial along with the insurer's attorneys, *see Ballard v. Citizens Casualty Co.*, 196 F.2d 96, 103 (7th Cir.1952), an excess carrier is neither estopped nor deemed to have assumed a duty by hiring lawyers to monitor an action.

In response to General Accident's allegation that Underwriters' lawyers by their conduct assumed a duty to actively participate in the Draper litigation, Underwriters submitted the declaration of John J. Martin. Martin was the supervising attorney in charge of monitoring the Draper action. Martin stated that the extent of Underwriters' lawyers' conduct relevant to the Draper action was threefold: a request to General Accident for information (Martin Dec. ¶ 2, ¶ 8); a review and confirmation of that information (Martin Dec. ¶ 9); and an acknowledgement of the Indianapolis Airport Authority as an additional named insured (Martin Dec. ¶ 7). In addition, Martin pointed out that Underwriters' lawyers saw no reason to become further involved in the action because they believed Kenworthy, not CFE, was primarily liable for Draper's injuries. (Martin Dec. ¶ 8, 9, 10).

General Accident has offered no evidence to rebut this proof of the limited scope of Underwriters' lawyers involvement, nor has it offered any evidence indicating that Underwriters' lawyers should have taken a more active role.[8] As a result, this Court is compelled to find that General Accident

has failed to support the duty element of its comparative fault and contributory negligence claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### b. *Estoppel/laches*

■ As stated *supra*, Underwriters is not estopped from recovery by hiring lawyers to monitor the Draper action. The instant case is distinguishable in this way from *Medical Protective*, 393 N.W.2d 479. In *Medical Protective*, the excess carrier *participated* in the settlement negotiations and *approved* the settlement amount. *Id.* 393 N.W.2d at 486. The court held that a summary judgment on the estoppel issue was improper, because issues of fact remained as to whether the primary carrier reasonably relied on the excess's participation. *Id.* 393 N.W.2d at 486. Here, however, General Accident has not shown that Underwriters participated in the settlement negotiations at all. A showing of some affirmative, misleading conduct is a necessary element of an estoppel claim. *See Alber v. Standard Heating & Air Conditioning*, 476 N.E.2d 507, 510 (Ind. App.1985) (elements of estoppel); *Walaschek & Associates v. Crow*, 733 F.2d 51, 54 (7th Cir.1984) (estoppel defined). General Accident has not shown that Underwriters engaged in any misleading conduct. Moreover, General Accident has not shown that it relied to its detriment on Underwriters' actions, and detrimental reliance is another necessary element of an estoppel claim. *Id.*

■ Finally, General Accident neither alleged nor demonstrated how it might have been prejudiced by Underwriters' inaction. Without such a showing, the laches defense fails. *Alber v. Standard Heating & Air Conditioning*, 476 N.E.2d 507, 509, 510 (Ind.App.1985).

General Accident's duty was to defend CFE, and to exercise good faith and due

---

8. The Court recognizes that certain underwriters of Lloyd's of London subscribed to a primary policy of insurance covering Kenworthy (Ex. C, General Accident's Response to Motion for Partial Summary Judgment). General Accident offers nothing to show that the subscribers to the Kenworthy policy had any commonality

with the subscribers to the CFE policy who are plaintiffs in this case. Absent such proof, this Court cannot infer from the existence of the Kenworthy policy any additional duty or knowledge on the part of Underwriters or Underwriters' lawyers.

care in negotiating a settlement, with proper solicitude to Underwriters' interests. Nothing Underwriters did or did not do has been shown to have altered General Accident's approach to those duties. This Court therefore GRANTS partial summary judgment on the affirmative defenses in favor of Underwriters and against General Accident.

### V. PLAINTIFFS' MOTIONS IN LIMINE

 Underwriters' first motion in limine seeks to exclude letters and telexes between Underwriters and their agents, on the ground that those communications are irrelevant, or alternatively that the communications would mislead the jury as to Underwriters' duty to participate in the Draper litigation. Their second motion seeks to exclude all other evidence which would confuse the jury into focusing on Underwriters' rather than General Accident's conduct.

Having granted Underwriters' motion for partial summary judgment, this Court will GRANT these motions in limine. As Underwriters aptly stated in its motion: "Evidence of plaintiffs' action or lack of action with respect to General Accident's defense of CFE is ... not relevant to this lawsuit and would confuse or prejudice the jury" (Plaintiffs' Motion in Limine No. 2). *See generally* Fed.R.Evid. 402 and 403. Underwriters had no duty to participate in the underlying action. Monitoring alone doesn't assume a duty. Inter-office memos in furtherance of monitoring are therefore irrelevant.

In its third motion in limine, Underwriters moves to exclude evaluations of CFE's liability which were not available to General Accident before the Draper jury returned the verdict. The Court GRANTS this motion. The perspective from which the jury must view General Accident's conduct is *ex ante* rather than *ex post*. *See Steele v. Hartford Fire Insurance Co.*, 788 F.2d 441, 447 (7th Cir.1986). Just as Underwriters should not be permitted to introduce after-the-fact evidence to show General Accident underestimated the likelihood of an adverse jury verdict, General Acci-

dent may not bolster its position with hindsight by introducing information discovered after the Draper trial.

The Court OVERRULES Underwriters' fourth motion in limine. That motion seeks to exclude all evidence of events that occurred after the Draper jury returned its verdict. This Court finds that the evidence of the final settlement negotiations is relevant to General Accident's continuing duty and to the measure of damages and is thus admissible under Fed. R.Evid. 402. Underwriters has presented no cogent argument to show that the danger of prejudice from this evidence substantially outweighs its probative value.