**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Appellant/Cross–Appellee,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Appellant/Cross–Appellee,**

v.

**KECK, Mahin & Cate, Grant Cook, and Robert A. Plessala, Appellees/Cross–Appellants.**

No. 14–96–00049–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 16, 1997.

Rehearing Overruled Nov. 26, 1997.

Robert B. Summers, Austin, for appellants.

William K. Wilde, Iris H. Robinson, Houston, for appellees.

Before LEE, AMIDEI and EDELMAN, JJ.

## OPINION

LEE, Justice.

This is an equitable subrogation case in which the excess insurance carrier sued the primary insurance carrier and the insured's attorneys. National Union Fire Insurance Company of Pittsburgh, Pa. ("National") sued Insurance Company of North America("INA") and the law firm of Keck, Mahin & Cate and two of its attorneys, Grant Cook and Robert A. Plessala (collectively "KMC"). INA filed a third-party action against KMC. All parties filed full or partial motions for summary judgment. The trial court (1) granted summary judgment in favor of KMC on all claims asserted by National and INA; (2) granted summary judgment in favor of INA on claims by National for violation of article 21.21 of the Texas Insurance Code and gross negligence, but denied summary judgment as to negligence; and (3) granted partial summary judgment in favor of National on INA's and KMC's affirmative defenses of contributory negligence and comparative responsibility. National and INA appeal raising points of error challenging the trial court's rulings, and KMC raises a conditional cross-point in the event we reverse the trial court's judgment as to KMC. We affirm in part, and reverse and remand in part.

In September of 1991, Wolf Point Shrimp Farm and its owner ("Wolf Point") filed suit against Granada Food Corporation ("Granada") for damages allegedly caused by Granada's improper processing and marketing of shrimp grown and harvested at the Wolf Point shrimp farm in the fall of 1990. Granada initially hired KMC to defend it in the Wolf Point litigation. In November of 1991, KMC tendered the defense of the suit to Granada's primary insurance carrier, INA, and Granada's excess insurance carrier, National. INA had issued a comprehensive general liability insurance policy effective from June 1, 1990, to June 1, 1991, covering Granada with a $1 million per occurrence policy limit. National had provided Granada with a commercial umbrella liability policy effective from June 4, 1990, to July 21, 1991,

which provided excess coverage for Granada's liability from $1 million to $10 million.

INA agreed to defend Granada in the Wolf Point suit; however, its response to Granada's defense tender and demand for coverage included a reservations of rights. National never issued a reservation of rights to Granada. Under the operating instructions of the INA policy, Granada had the right to select its own defense counsel, and Granada chose to have KMC continue its representation. Thus, INA engaged KMC to defend Granada in the Wolf Point litigation and paid its fees.

During the pendency of the suit, Wolf Point's counsel made a settlement demand upon Granada for $3.6 million. Neither Granada nor the insurance carriers accepted this demand. INA points out that this was not a *Stowers* demand upon INA because it was not within INA's $1 million policy limits, and therefore, INA could not have settled without contribution from either Granada or National. *See G.A. Stowers Furniture Co v. American Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App.1929, holding approved). National, on the other hand, contends INA never requested National contribute toward a settlement, and in fact advised National that the suit could be settled within the primary policy limits of $1 million.

In January of 1992, the trial court signed an order giving the Wolf Point suit a preferential trial setting of April 28, 1992. While the attorneys for Wolf Point were busy with discovery in anticipation of the trial, KMC, according to INA and National, had taken little if any action on behalf of Granada. KMC filed a motion for continuance on April 16, 1992, but could not obtain a hearing on the motion until the first day of trial. The trial court denied the motion for continuance and trial began the next day. The day the trial began, INA tendered its policy limits to National. On April 30, 1992, during trial, National negotiated and settled the Wolf Point suit for $7 million. INA contributed its $1 million policy limits, and National paid the remaining $6 million. The final judg-

ment in the Wolf Point case was signed and entered in May of 1992.

Less than two years after the final judgment was entered in the Wolf Point suit, National filed suit in state court against INA alleging negligence, gross negligence, and violations of the Texas Insurance Code. Soon after National sued INA, INA filed a third-party petition against KMC alleging legal malpractice and entitlement to contribution and/or indemnity from KMC. National added KMC as a defendant in the suit alleging legal malpractice.[1] Both INA and KMC asserted affirmative defenses of contributory negligence and comparative responsibility; they also asserted contribution claims against each other. National alleged that both INA and KMC had mishandled Granada's defense, and sought recovery of the $6 million it paid to settle the Wolf Point suit as well as punitive damages. National's suit was based on the doctrine of equitable subrogation as set out in *American Centennial Ins. Co. v. Canal*, 843 S.W.2d 480, 483 (Tex.1992). Under equitable subrogation, National stepped into the shoes of its insured, Granada, and became Granada's subrogee. *See id.*

Each of the parties filed a motion for partial and/or complete summary judgment. National filed a motion for partial summary judgment on the affirmative defenses of contributory negligence and comparative responsibility alleging its conduct was immaterial because, as an excess carrier, it had no duty to investigate, provide a defense, or participate in settlement negotiations until INA tendered its primary policy limits. INA sought summary judgment on the grounds that National had no cause of action as an equitable subrogee based on the facts of the case. Specifically, INA argued National was limited to its negligence claim and that such a claim was limited to an assertion that INA negligently failed to accept a reasonable settlement demand within its primary policy limits. Thus, INA argued, National could not recover punitive damages. INA also argued National paid the $6 million as a "volunteer," and therefore, it could not recover

---

1. National originally filed suit against KMC in federal court. The federal suit was dismissed in April of 1995. After the dismissal, National add-ed KMC to the suit it had previously filed in state court against INA.

under an equitable subrogation theory. KMC filed a motion for summary judgment incorporating INA's arguments on punitive damages and the assertion that National paid the $6 million voluntarily. KMC also argued that any claims asserted by National or INA were barred by a written release entered into between KMC and Granada weeks before the Wolf Point suit was called to trial.

On September 11, 1995, the trial court signed an interlocutory order granting various forms of relief to each of the parties on their respective motions for summary judgment. The trial court ruled:

(1) National was entitled to judgment as a matter of law on INA's and KMC's affirmative defenses of contributory negligence and comparative responsibility;

(2) KMC was entitled to judgment as a matter of law on all claims based on the release; and

(3) INA was entitled to judgment as a matter of law on National's claims for gross negligence and violations of the Texas Insurance Code, but the court denied INA's motion for summary judgment as to National's negligence claim.

On September 13, 1995, the trial court signed an order granting a severance as to the only pending claim, the negligence claim against INA, and entered a final judgment that National and INA take nothing against KMC. National and INA independently perfected appeals from this judgment.

In reviewing a trial court's order granting summary judgment, the court must determine whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). The movant has the burden to show there is no genuine issue of material fact, and that it

is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548-49 (Tex.1985). Evidence favorable to the non-movant will be taken as true and every reasonable inference indulged in its favor. *Id.*

There are three main issues raised by the parties in this case: (1) whether the release between KMC and Granada bars all claims by National and INA; (2) whether the defenses of contributory negligence and/or comparative responsibility are available in an equitable subrogation action such as this; and (3) whether under the doctrine of equitable subrogation an excess carrier may recover on any claims other than negligence in a suit against a primary carrier.

Before reviewing these issues, however, we address a contention raised in INA's ninth point of error. In that point, INA argues the trial court erred in denying its motion for summary judgment as to the negligence claims asserted by National.[2]

## DENIAL OF INA'S SUMMARY JUDGMENT ON NATIONAL'S NEGLIGENCE CLAIM

Generally, a denial of a motion for summary judgment is not reviewable on appeal. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex.1996) (citing *Novak v. Stevens*, 596 S.W.2d 848, 849 (Tex.1980)). This is because a denial of a summary judgment is not a final judgment. *Id.* There are, however, two exceptions to this general rule. When both parties file motions for summary judgment and the trial court grants one and denies the other, the denial may be appealed. *See Davis v. Manning*, 847 S.W.2d 446, 452 (Tex.App.—Houston [14th Dist.] 1993, no writ). An appeal from the denial of a motion for summary judgment is also proper when the denial is: (1) based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state; or (2) based in whole or

2. INA provides no authority or argument within their point of error as to the basis upon which this court can review the denial of INA's motion for summary judgment on the negligence claim. In response to questions during oral argument, counsel for INA told the court that all of the

necessary evidence was before the court and that the issue should be addressed as a matter of judicial economy. Counsel, however, did not cite the court to any authority supporting this argument.

in part upon a claim against or defense by a member of the media, acting in such capacity, or a person whose communication appears in or is published by the media, arising under the free speech or free press clause of the First Amendment of the United Stated Constitution, or Article 1, Section 8 of the Texas Constitution. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5)-(6) (Vernon 1997). The trial court's denial of INA's motion for summary judgment on the negligence claim does not fall within either of these exceptions, and therefore, is not appealable. Thus, we overrule INA's ninth point of error.

We now begin our review of the remaining issues in this case by first addressing the legal effect of the release on the claims asserted against KMC by National and INA.

## THE RELEASE

On April 10, 1992, KMC and Granada entered into a written release. In exchange for KMC's promise to discharge Granada from any demands KMC might have for unpaid fees, Granada allegedly released KMC from all claims for the rendition of legal services by KMC to Granada between June 1, 1988, and April 1, 1992. In points of error one through three,[3] National claims the trial court erred in granting summary judgment

in favor of KMC based on the release. INA makes the same contention in its points of error one through six. The arguments raised by National and INA within their respective points of error essentially mirror each other.

■ KMC argued, and the trial court agreed, that the release executed by Granada and KMC was an absolute defense to any malpractice claims arising out of the firm's handling of the Wolf Point suit.[4] On the other hand, National and INA argue the release does not encompass any legal malpractice claims arising out of the Wolf Point lawsuit. They argue that the terms of the release clearly show that the release was only applicable to legal malpractice in suits in which the legal fees were unpaid. It is undisputed that all of the legal fees in the Wolf Point suit were paid. Alternatively, National and INA contend the release is ambiguous. Consequently, we must determine whether the release between Granada and KMC released KMC from legal malpractice claims arising out of the Wolf Point suit.

The relevant portions of the release, including those paragraphs containing the promises exchanged by KMC and Granada, state:

\* \* \*

3. Point of error one is a general point that states "The trial court erred by granting summary judgment in favor of the Keck Appellees." Points of error two through seven are specific contentions subsumed under this general contention. In our opinion we will refer to a specific argument by the point of error to which it specifically relates. We will rule on point of error one by ruling on the points containing a specific contention.

4. We note that KMC also moved for summary judgment against INA asserting that INA lacked standing to contest the scope or validity of the release. KMC makes that same argument in its brief in response to INA's brief. In its order, the trial court specifically granted summary judgment for KMC based upon the affirmative defense of release; it did not grant summary judgment to KMC, as to INA, based upon a lack of standing. In the interest of judicial economy, an appellate court may consider summary judgment grounds the movant preserved for review and the trial court did not rule on. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 627 (Tex.1996). A movant preserves such grounds for review by raising them in cross-points. *See id.* at 626. KMC did not raise a cross-point contending the

trial court erred in denying it motion for summary judgment as to INA on the ground that INA lacked standing to challenge the release. Moreover, the supreme court has given appellate court discretion in addressing such grounds, and we decline to do so in this case. *Id.* at 627. Therefore, we will not address KMC's contention that, as a matter of law, INA lacked standing to contest the validity and scope of the release.

In its brief, KMC makes two other arguments that are separate from its defense of release. KMC argues the trial court correctly granted summary judgment in its favor because: (1) third party non-clients cannot maintain claims against attorneys; and (2) common law indemnity has been abolished. These grounds are not contained in KMC's motion for summary judgment. Summary judgment cannot be affirmed on appeal on grounds not presented to the trial court in the summary judgment motion. *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993); *Kaye v. Harris County Mun. Util. Dist. No. 9*, 866 S.W.2d 791, 793 (Tex.App.—Houston [14th Dist.] 1993, no writ). Therefore, we will review the summary judgment granted in favor of KMC only on the ground of release.

WHEREAS, KMC has performed legal services for Granada since June of 1988;

WHEREAS, as of the date written above, Granada owes KMC a substantial sum for outstanding and unpaid invoices for professional legal services rendered to Granada up to April 1, 1992 (the "Unpaid Fees");

WHEREAS, KMC and Granada desire to resolve the issue of the Unpaid Fees to their mutual satisfaction; and

\* \* \*

NOW, THEREFORE, in exchange for the mutual promises, agreements and releases herein contained, KMC and Granada do hereby as follows:

1. KMC hereby releases, and by these presents does hereby release, acquit and forever discharge Granada, its agents, servants, employees, officers, directors, affiliates and all persons, natural or corporate, in privity with them or any of them from any demands, claims or causes of action of any kind which KMC had or might have, directly or indirectly attributable to the Unpaid Fees owed to KMC by Granada for professional legal services rendered between June 1, 1988 and April 1, 1992, it being intended to release Granada from any obligation to pay such Unpaid Fees.

2. Granada hereby releases and by these presents does hereby release, acquit and forever discharge KMC, its agents, servants, employees, partners, affiliates and all persons, natural or corporate, in privity with it, from any and all demands, claims or causes of action of any kind whatsoever, statutory, at common law or otherwise, now existing or that might arise hereafter, directly or indirectly attributable to the rendition or [sic] professional legal services by KMC to Granada between June 1, 1988 and April 1, 1992.

\* \* \*

▬▬ A release is a writing providing that a duty or obligation owed to one party to the release is discharged immediately or on the occurrence of a condition. RESTATEMENT (SECOND) OF CONTRACTS § 284 (1981). In this case, KMC claims the release discharged Granada from the payment of unpaid legal fees, and in consideration, Granada agreed to discharge KMC from liability for any malpractice claims attributable to the rendition of legal services by KMC to Granada between June 1, 1988, and April 1, 1992. Under Texas law, a release is a contract and is subject to the rules governing contract construction. See Williams v. Glash, 789 S.W.2d 261, 264 (Tex.1990) (holding release is a contract subject to avoidance on same grounds as any other contract); Loy v. Kuykendall, 347 S.W.2d 726, 728 (Tex.Civ. App.—San Antonio 1961, writ ref'd n.r.e.) (treating release as a contract subject to rules governing construction thereof); RESTATEMENT (SECOND) OF CONTRACTS § 284 cmt. c (1981). In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983); Preston Ridge Fin. Servs. Corp. v. Tyler, 796 S.W.2d 772, 775 (Tex.App.—Dallas 1990, writ denied). The intention of the parties is discovered primarily by reference to the words used in the contract. Tyler, 796 S.W.2d at 775. To determine the intentions of the parties, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. Coker, 650 S.W.2d at 393; Tyler, 796 S.W.2d at 775. No single provision taken alone will be given controlling effect; rather, all of the provisions must be considered with reference to the entire contract. Id. In harmonizing contract provisions, terms stated earlier in an agreement must be favored over subsequent terms. Coker, 650 S.W.2d at 393; Tyler, 796 S.W.2d at 778.

▬▬ Evidence of circumstances surrounding the execution of the contract may be considered in the construction of an unambiguous instrument, even though oral statements of the parties' intentions are inadmissible to vary or contradict the terms of the agreement. Medical Towers, Ltd. v. St. Luke's Episcopal Hosp., 750 S.W.2d 820, 822 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (citing Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex.1982)). The circumstances help to illuminate the contractual language chosen by the parties and

enable evaluation of "the objects and purposes intended to be accomplished by them in entering into the contract." *St. Luke's,* 750 S.W.2d at 823 (quoting *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 512 (1942)). A contract should be construed by determining how the "reasonable person" would have used and understood such language, considering the circumstances surrounding its negotiation and keeping in mind the purposes intended to be accomplished by the parties when entering into the contract. *Manzo v. Ford,* 731 S.W.2d 673, 676 (Tex.App.—Houston [14th Dist.] 1987, no writ).

■ In addition to these basic contract construction rules, however, we must take into account the rules that specifically apply to releases. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex.1991). To effectively release a claim in Texas, the releasing instrument must "mention" the claim to be released. *Brady,* 811 S.W.2d at 938. "Any claims not *clearly* within the subject matter of the release are not discharged." *Id.* (emphasis added). General categorical releases are to be narrowly construed. *Id.* (citing *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 422 (Tex.1984)).

■ National and INA disagree with KMC over the proper interpretation of the release. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Coker,* 650 S.W.2d at 394 (citing *R & P Enters. v. La Guarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980)); *St. Luke's,* 750 S.W.2d at 822. A contract is ambiguous when it is subject to more than one reasonable meaning, unresolvable by rules of interpretation. *St. Luke's,* 750 S.W.2d at 822 (citing *Skelly Oil v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 778 (1962)). Disagreement over the proper interpretation of a release does not automatically make it ambiguous. *See St. Luke's,* 750 S.W.2d at 822 (holding that disagreement over interpretation of an instrument does not automatically make it ambiguous). Likewise, uncertainty or lack of clarity in the language chosen by the parties is insufficient to render a contract ambiguous. *Tyler,* 796

S.W.2d at 777 (citing *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951)); *St. Luke's,* 750 S.W.2d at 822.

If the contract is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Coker,* 650 S.W.2d at 393 (citing *R & P Enters.,* 596 S.W.2d at 519; *Universal C.I.T.,* 243 S.W.2d at 157). A contract is ambiguous only when, after the application of the proper rules of construction to the face of the instrument, it remains reasonably susceptible to more than one meaning. *Tyler,* 796 S.W.2d at 776 (citing *Universal C.I.T.,* 243 S.W.2d at 157); *see also Skelly Oil,* 356 S.W.2d at 778. With all of these general rules and principles in mind, we now examine the release at issue in this case.

■ We begin with the issue of ambiguity. We find that using the proper rules of construction, the language of the release is subject to only one *reasonable* interpretation. *See St. Luke's,* 750 S.W.2d at 822 (emphasis added). When the intention of the parties is expressed in language that is not susceptible of more than one meaning, the question is not one of interpretation; rather, the only issue to be resolved is the effect of the language. *Id.* Thus, while the parties disagree over the proper effect of the release, we hold that it is not ambiguous. An unambiguous contract must be interpreted by the court as a matter of law. *Coker,* 650 S.W.2d at 393; *St. Luke's,* 750 S.W.2d at 823.

Using the rules of contract construction and the rules applicable to releases, we now review the release to determine its effect. The first part of the release states that KMC has performed legal services for Granada and that Granada owes a "substantial sum" in outstanding fees for legal services rendered to Granada from June 1, 1988, to April 1, 1992. National and INA contend the next line of the release plainly establishes the parties' intent in entering into the release:

**WHEREAS,** KMC and Granada desire to resolve the issue of the Unpaid Fees to their mutual satisfaction[.]

They argue this language, contained at the beginning of the release, clearly evidences the parties' purpose in entering into the release: to settle the unpaid fees owed by Granada to KMC for legal services rendered within a certain time frame. National and INA contend that based on the expressed intent in the release, the only claims from which KMC was released were those in which Granada had not paid its legal fees. KMC argues that the parties' intent is contained in paragraph two of the release in which Granada purports to release KMC from "any and all demands, claims or causes of action of any kind whatsoever, statutory, at common law or otherwise, now existing or that might arise hereafter."

 In harmonizing the provisions of the release, terms stated earlier in the release must be favored over other subsequent terms. *See Coker,* 650 S.W.2d at 393; *Tyler,* 796 S.W.2d at 778. We hold that the intention of the parties in entering into this release was to resolve the issue of unpaid fees, not to release KMC from any and all legal malpractice claims. The language relied on by KMC is merely the part of the release where Granada agrees to release KMC from liability according to the terms stated earlier in the release; paragraph two does not control the proper construction of the release. Thus, construing the release in light of the parties' plainly stated intent to resolve Granada's failure to pay its legal fees, we find that Granada did not release KMC from legal malpractice claims arising out of the Wolf Point suit because the fees in that suit were paid.

Our interpretation is supported by the rules governing releases. The language relied on by KMC is paragraph two is notably broad, and therefore, must be narrowly construed. *See Brady,* 811 S.W.2d at 938. The release does not "mention" the Wolf Point lawsuit or any other suit in which legal fees were paid. The only claims specifically released in the document are those in which Granada had failed to pay its legal fees. Thus, the claims arising out of the Wolf Point suit were not effectively released because they are not clearly within the subject matter of the release. *Id.*

Finally, we agree with National and INA that the release could not have been intended to cover claims arising from the Wolf Point suit because the release does not cover acts of malpractice occurring *after* April 1, 1992. The trial in the Wolf Point suit did not even begin until the last week of April. The release states that Granada released KMC for legal malpractice claims in connection with KMC's rendition of legal services to Granada "between June 1, 1988 and April 1, 1992." KMC argues that release did discharge it from liability even for acts after April 1, 1992, as long as some conduct was committed before that date. KMC points to language in the release that states that KMC is released for claims *"directly or indirectly attributable* to the rendition or [sic] professional legal services ... between June 1, 1988 and April 1, 1992."

The summary judgment evidence, viewed in the light most favorable to National and INA, shows that certain acts of malpractice may have occurred after April 1, 1992.[5] KMC contends this is of no consequence because while the release referred to only past acts (before April 1, 1992), it released *claims* for acts regardless of whether they occurred before or after April 1, 1992. We disagree with KMC's interpretation. The "directly or indirectly attributable" language modifies the phrase "to the rendition of professional legal services by KMC;" it does not modify the dates. This interpretation is supported by the very next sentence, which does not contain the "directly or indirectly" language, and states that all claims in connec-

---

5. KMC argues that National's pleadings allege only post-April 1, 1992 acts, and therefore, the release barred its claims. We disagree. The proper legal construction of the lease is not dependent upon National's pleadings. Furthermore, the summary judgment evidence submitted by National shows that its expert testified that KMC should have taken certain action well before trial, or, at the very least KMC should have taken certain actions before the trial began in late April. The trial in the Wolf Point suit did not begin until the last week of April, and thus, there was three-week window of opportunity in which KMC may have committed acts of malpractice. As to INA's allegations, they were broad and sufficient to include acts of malpractice before and after April 1, 1992.

tion with legal services *between June 1, 1988 and April 1,* 1992, are released. Thus, while claims directly or indirectly attributable to KMC's rendition of legal services may have been released, the acts giving rising to such claims must have occurred between June 1, 1988, and April 1, 1992 to be covered by the release.

Based on the parties' intent and the other language contained in the release, we hold that the release did not discharge KMC from claims arising from its representation of Granada in the Wolf Point suit. Therefore, National's and INA's claims are not barred on the basis of the release. We sustain National's first through fourth points of error, and INA's first through third points of error. Because we have sustained INA's first through third points, we need not address its points five and six.

We must now determine whether the trial court erred in ruling that National could not, as a matter of law, recover the portion of the settlement money attributable to Wolf Point's lost profits.

## LOST PROFITS

■ In points of error one, four, and five, National argues the trial court erred in ruling that National could not recover any of the settlement money that was attributable to lost profits. In its motion for summary judgment, and now in its brief, KMC argues the summary judgment proof established as a matter of law that Wolf Point Shrimp Farm was a new or "start-up" business. KMC contends that at the time the Wolf Point suit was settled, "lost profits were not recoverable as damages under Texas law for new businesses." National responds that KMC presented no summary judgment proof to show that Wolf Point was a new business or that any of the settlement money was for lost profits. Further, National contends that even if KMC did prove Wolf Point Shrimp Farm was a new business, it still was not entitled to summary judgment because the absence of a history of profits does not, by itself, preclude damages for lost profits.

In support of its contention, KMC mistakenly relies on *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80 (Tex.1992). In that

case, the plaintiffs had produced legally insufficient evidence of lost profits. *Id.* at 85–86. The court never discussed the issue of lost profits relative to new businesses. Some of the other cases relied on by KMC date do state that lost profits may not be recovered if the business is new or unestablished. *See Anbeck Co. v. Zapata Corp.,* 641 S.W.2d 608, 616 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Bell Helicopter Co. v. Bradshaw,* 594 S.W.2d 519, 535 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *Ganda, Inc. v. All Plastics Molding, Inc.,* 521 S.W.2d 940, 943 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.). These cases, insofar as they state a rigid rule as to lost profits and new businesses, do not accurately reflect the supreme court's statement of the law as it now exists and as it existed at the time of the Wolf Point settlement.

The rule for recovery of lost profits was originally stated by the Texas Supreme Court in 1938:

> The various legal encyclopaedias [sic] and textbooks lay down certain rules applicable to an action for damages for loss of profits. [T]he rule is stated in the following language: "The generally accepted rule is that, where it is shown that a loss of profits is the natural and probable consequences of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor; but anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated. So evidence to establish profits must not be uncertain or speculative. It is not necessary that profits should be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness."
>
> The rule as announced by the decisions of the courts of this state is summarized ... as follows: "In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable cer-

tainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions."

In the early decisions a rigid rule affecting the right of recovery for lost profits was announced. Modern business methods have caused a relaxation of that hard rule. *The rule denying recovery* where the facts show that such profits claimed are too uncertain or speculative, or *where the enterprise is new or unestablished, is still enforced*, on the ground that the profits which might have been made from such businesses are not susceptible of being established by proof to that degree of certainty which the law demands.

*Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938) (citations omitted) (emphasis added).

Apparently, the courts in the cases cited by KMC latched onto the statement that "the rule denying recovery . . . where the enterprise is new or unestablished, is still enforced . . . ," and based on that statement, assumed that lost profits could never be recovered when a new business or enterprise is involved. *See Anbeck,* 641 S.W.2d at 616; *Bell Helicopter,* 594 S.W.2d at 535; *Ganda, Inc.,* 521 S.W.2d at 943. This interpretation of *Southwest Battery* was, and is, incorrect. *See Texas Instruments, Inc. v. Teletron Energy Management, Inc.,* 877 S.W.2d 276, 280 (Tex.1994). Interpreting the rule announced in *Southwest Battery,* the supreme court stated that the fact that a business is new is but one consideration in applying the "reasonable certainty test." *Texas Instruments,* 877 S.W.2d at 280. The court held that the

rule from *Southwest Battery* denying recovery of lost profits "where the enterprise is new or unestablished" did not mean that recovery is denied simply because the business was new; rather, recovery is denied because the profits which might have been made from such businesses are not susceptible of being established by proof to the necessary degree of certainty. *Id.* The court recognized, however, that even with a new business, recovery for lost profits may be had "when there are firmer reasons to expect a business to yield a profit." *Id.* Thus, if a new business can provide sufficient evidence to show lost profits, it is not prohibited from recovering.

The interpretation stated by the supreme court in *Texas Instruments* was not new to this state. On the contrary, several cases had already recognized a new business could use other data besides past profit history to show anticipated profits to a reasonable certainty. *See Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 348 (1955) (opinion of business owner based on prior similar business' profit history); *Orchid Software, Inc. v. Prentice–Hall, Inc.,* 804 S.W.2d 208, 211–12 (Tex.App.—Austin 1991, writ denied); *First Title Co. of Waco v. Garrett,* 802 S.W.2d 254, 260 (Tex.App.—Waco 1990) (testimony of business owner based on prior similar business activity coupled with testimony by accountant using information provided by business owner), *aff'd in part and rev'd in part on other grounds,* 860 S.W.2d 74 (Tex.1993); *Pena v. Ludwig,* 766 S.W.2d 298, 301 (Tex. App.—Waco 1989, no writ) (opinion of business owner based on prior similar business' profit history); *Universal Commodities, Inc. v. Weed,* 449 S.W.2d 106, 113 (Tex.Civ.App.—Dallas 1969, writ ref'd n.r.e.).

The rule stated in these earlier cases, that the mere fact that a business is new does not automatically preclude recovery for lost profits, has continued support in the most recent case law. *See Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 351 (Tex.App.—Fort Worth 1996, no writ) (holding that new business may recover lost profits; focus is on experience of persons involved in business, nature of the business activity, and the relevant market); *Thedford v. Missouri Pacific*

*R.R. Co.*, 929 S.W.2d 39, 49 (Tex.App.—Corpus Christi 1996, writ denied) (same); *Regency Advantage Ltd. Partnership v. Bingo Idea–Watauga, Inc.*, 928 S.W.2d 56, 61–62 (Tex.App.—Fort Worth 1995) (holding that testimony by corporate finance and financial planning expert that location could be used to determine lost profits, technique and calculations he used, and why his calculations were proper was sufficient to prove lost profits for new business), *aff'd in part and rev'd in part on other grounds*, 936 S.W.2d 275 (Tex.1996). Clearly, while lost profits of a new or unestablished business generally cannot be recovered because they cannot be proved to a "reasonable certainty," they may be recovered if factual data is available to furnish a sound basis for computing probable losses. This rule is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise. *Texas Instruments*, 877 S.W.2d at 279. Current Texas case law is in line with the vast majority of jurisdictions that have rejected a "new business rule" as a per se rule of exclusion. *See* Annotation, *Recovery of Anticipated Lost Profits of New Businesses: Post–1965 Cases*, 55 A.L.R.4th 507 (1987).

■ Whether lost profits are too speculative or remote to support recovery depends upon the facts and circumstances of the particular case. *Texas Instruments*, 877 S.W.2d at 279; *Pena*, 766 S.W.2d at 301. What constitutes "reasonably certain evidence" of lost profits is a "fact intensive" determination. *Texas Instruments*, 877 S.W.2d at 279 (quoting *Whiteside v. Trentman*, 141 Tex. 46, 170 S.W.2d 195, 197 (1943)).

■ KMC, as the summary judgment movant, had the burden of showing itself entitled to judgment as a matter of law. It attempted to do so by showing that Wolf Point Shrimp Farm was a new enterprise that was engaged in a business dependent on market fluctuations. Based on these facts, KMC argued it was entitled to judgment as a matter of law. We disagree.

KMC did not attempt to disprove the existence of other data from which lost profits could be proven to a reasonable certainty; nor did it establish whether National contends that such other data exists. *See Orchid Software*, 804 S.W.2d at 211. As the cases cited above show, lack of a past history of profits is not necessarily proof that future lost profits are too speculative to be recovered; lost profits may be proved by other evidence. By proving that Wolf Point Shrimp Farm was a new or "start-up" enterprise, KMC did not establish as a matter of law that lost profits could not be proven with reasonable certainty through other means. Therefore, the trial court erred in granting summary judgment in favor of KMC on this issue. We sustain points of error four and five.

We must now determine whether the trial court erred in ruling that National could not, as a matter of law, recover punitive damages against KMC.

## PUNITIVE DAMAGES

In points of error one, six, and seven, National argues the trial court erred in granting summary judgment in favor of KMC on National's claims for punitive damages. National argues that because Granada, the client, would be entitled to recover punitive damages if it proved gross negligence, National has the same right as Granada's equitable subrogee. KMC disputes National's argument, relying on the concurring opinion in *American Centennial.*

In *American Centennial*, the supreme court held, for the first time, that an excess carrier was entitled to bring an equitable subrogation action against a primary carrier and defense counsel.[6] 843 S.W.2d at 483–84. In his concurrence, Justice Hecht agreed with the holding, and then discussed the types of claims, defenses, and damages available to an excess carrier bringing a suit

---

**6.** In holding that an excess carrier may bring an equitable subrogation action against a primary carrier, the Texas Supreme Court cited similar holdings by numerous other states' courts. *See American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482–83 (Tex.1992). The common policy justifications underlying all of the courts' holdings were to: (1) encourage fair and reasonable settlement of lawsuits; (2) prevent an unfair distribution of losses among primary and excess insurers; (3) protection from increased premiums by excess carriers. *Id.*

based on equitable subrogation. *See id.* at 485–86. We recognize that the discussion of these issues in the concurrence is merely dicta; however, we find it persuasive because a majority of the justices of the supreme court joined in the concurrence.[7]

 On the issue of statutory or punitive damages and equitable subrogation, a majority of the justices agreed that as a general rule, subrogation gives indemnity and no more. *American Centennial*, 843 S.W.2d at 485 (citing *Phipps v. Fuqua*, 32 S.W.2d 660, 663 (Tex.Civ.App.—Amarillo 1930, writ ref'd)). In other words, a party who successfully brings suit based on the doctrine of equitable subrogation can only recover the amount he was required to pay because of the actions of the defendant. This view of equitable subrogation was adopted by the Dallas Court of Appeals in *Interfirst Bank Dallas v. United States Fidelity & Guar. Co.*, 774 S.W.2d 391, 399 (Tex.App.—Dallas 1989, writ denied). In that case, the court held subrogation rights cover only the amount paid to discharge the obligation; it does not entitle the subrogee to cost or expenses. *Id.* Therefore, based on the general tenets of the doctrine of equitable subrogation, a majority of the supreme court agreed that an excess carrier is not entitled to recover damages to recover statutory or punitive damages. *American Centennial*, 843 S.W.2d at 485 (citations omitted). We will follow the view of the majority of the supreme court justices, and therefore hold that an excess carrier, who brings suit based on the doctrine of equitable subrogation, cannot recover statutory or punitive damages from the primary carrier or the insured's defense counsel. Therefore, National is not entitled to recover punitive damages from KMC.

National argues that the statements concerning statutory or punitive damages in the concurring opinion in *American Centennial* are limited to claims against the primary carrier, not defense counsel. While the statements are made in reference to claims

against a primary carrier, we find this to be a distinction without a difference. Whether the defendant is the primary carrier or the insured's attorney, the excess carrier's cause of action exists only under the guise of equitable subrogation. If an excess carrier is denied punitive or statutory damages against the primary carrier because it is only entitled to be made whole, the same rule should logically apply to any suit brought against any other defendant under the doctrine of equitable subrogation. Therefore, we hold the trial court correctly granted summary judgment for KMC on the issue of punitive damages. We overrule National's points of error six and seven.

The next issue in this case is also resolved by *American Centennial* and concerns National's complaint that the trial court erred in granting summary judgment in favor of INA on all of National's claims except for negligence.

## DTPA, INSURANCE CODE, AND GROSS NEGLIGENCE CLAIMS

In points of error eight through ten, National contends the trial court erred in granting INA's motion for partial summary judgment, thereby ruling that the only claim National could bring against INA was a negligence claim under *Stowers*. National argues it was not restricted to a negligence claim, and was entitled to brings claims for gross negligence and violations of the DTPA and Texas Insurance Code.

 In *American Centennial*, the excess carriers asserted claims against the primary carrier based upon negligence, gross negligence, breach of a duty of good faith and fair dealing, and violations of the DTPA and the Texas Insurance Code. 843 S.W.2d at 481. In deciding that an excess carrier could sue a primary carrier under the doctrine of equitable subrogation, the main opinion, relying on *Stowers* and *Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656 (Tex.1987), began its

---

7. Chief Justice Phillips and Justices Gonzalez, Cook, and Cornyn joined in Justice Hecht's concurring opinion. *American Centennial*, 843 S.W.2d at 486. Though a majority of the justices joined the concurrence, the opinion still refers to it as a concurrence rather than the majority opinion. *See id.* On this basis, we shall refer to the concurrence as such, and refer to the first part of the opinion, written by Justice Doggett, as the main or majority.

analysis by noting that Texas law vests a clear right in the insured "to sue the primary carrier for a wrongful refusal to settle a claim within the limits of the policy." *American Centennial*, 843 S.W.2d at 482 (citing *Stowers*, 15 S.W.2d at 546–47). In *Ranger County*, the supreme court extended the *Stowers* duty to settle within policy limits to include duties of investigation, preparation for the defense of a lawsuit, trial of the case, and reasonable attempts to settle. *See American Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 849 (Tex.1994) (opinion on reh'g); *American Centennial*, 843 S.W.2d at 482 (citing *Ranger County*, 723 S.W.2d at 659). Thus, the insured is not limited to a claim for negligence based on the insurer's failure to settle within the limits of the policy; rather, the insurer's duty to the insured extends to the full range of the agency relationship. *Ranger County*, 723 S.W.2d at 659; *Emscor Mfg., Inc. v. Alliance Ins. Group*, 879 S.W.2d 894, 909 (Tex.App.—Houston [14th Dist.] 1994, writ denied).

In *American Centennial*, the court noted that under a theory of equitable subrogation, an insurer paying a loss under a policy becomes equitably subrogated "to any cause of action the insured may have against a third party responsible for the loss." *Id.* The court accepted the right of an excess carrier to sue based upon the theory of equitable subrogation, but cautioned that the fact that an excess carrier could now bring an equitable subrogation action against a primary carrier did not impose new or additional burdens on the primary carrier apart from those established in *Stowers* and *Ranger County*. *Id.* at 483.

Though the main opinion declined to determine whether the doctrine of equitable subrogation would extend to permit claims for gross negligence and violations of the DTPA and Insurance Code,[8] the court's reliance on *Stowers* and *Ranger County* moved a majority of the justices to agree, in the concurring opinion, that the excess carriers only cause of actions is for negligence. *American Centen-*

nial, 843 S.W.2d at 486. We agree with the position stated in the concurrence.

■ In the main opinion, the court specifically stated that under a theory of equitable subrogation, the excess carrier was equitable subrogated to any cause of action *the insured may have* against a third party responsible for the loss. The court relied on *Stowers* and *Ranger County* in setting out those duties of the primary carrier. The only claim given to an insured under *Stowers* and *Ranger County* is negligence. Moreover, the main opinion specifically found that allowing an excess carrier to bring suit based equitable subrogation did not impose new or additional burdens on the primary carrier because the decisions in *Stowers* and *Ranger County* "imposed clear duties on the primary carrier to protect interest of the insured." *American Centennial*, 843 S.W.2d at 483. The analysis in the main opinion leads us to find, as did a majority of the justices in *American Centennial*, that the only claim available to an excess carrier, who is suing a primary carrier under the doctrine of equitable subrogation, is negligence. *See American Centennial*, 843 S.W.2d at 486.

■ Furthermore, limiting an excess carrier to a negligence claim is logical because of the nature of equitable subrogation. As we discussed in our review of points of error six and seven, equitable subrogation gives indemnity and no more. *Id.* Because we have held that an excess carrier cannot recover statutory or punitive damages, allowing it to bring claims for gross negligence or violations of the DTPA or Insurance Code would be pointless. We hold that an excess carrier cannot, as a matter of law, brings claims for gross negligence or violations of the DTPA and Insurance Code against a primary carrier in a suit based upon equitable subrogation; the primary carrier is limited to an action for negligence. *Id.* We overrule points of error eight through ten.

We now must review the common points of error raised by KMC and INA. They contend the trial court erred by striking the affirma-

---

8. The court, in its main opinion, declined to address this issue because any claims against the primary carrier for gross negligence, and viola-

tions of the DTPA and Insurance Code were barred by the statute of limitations. *American Centennial*, 843 S.W.2d at 483.

tive defenses of contributory negligence and/or comparative responsibility.

## KMC'S AND INA'S AFFIRMATIVE DEFENSES

In KMC's conditional cross-point and INA's seventh and eighth points of error, KMC and INA claim the trial court erred in granting National's motion for partial summary judgment, thereby striking the affirmative defenses of contributory negligence and/or comparative responsibility. National claims the trial court correctly granted its motion because KMC and INA are not entitled to assert contributory negligence and/or comparative responsibility against National. KMC and INA argue they are legally and equitably entitled to introduce National's misconduct to a jury upon trial of the case.

A majority of the justices briefly addressed this issue in the concurrence in *American Centennial* stating:

> The primary carrier is entitled to assert any defense available against either the insured or the excess carrier.

> \*　　\*　　\*

> Like the primary carrier, the attorney would have any defense available against either the insured or the excess carrier, including the excess carrier's unreasonable refusal to cooperate in the defense and settlement of the action.

*American Centennial*, 843 S.W.2d at 485–86.

These statements, conclusions as to the defenses available to primary carriers and defense attorneys in equitable subrogation suits brought by excess carriers, were made without the inclusion of analysis, reasoning, or citation to authority. The concurrence does not specify which defenses are "available" to an excess carrier in an equitable subrogation action other than the unreasonable refusal to cooperate in the defense and settlement of the action. *See id.* Moreover, the concurrence does not specify *when* the excess carrier's "cooperation" must occur to avoid the assertion of the defense: before the primary carrier tenders its primary limits, or after. While we agree that a primary carrier or an insured's defense attorney may assert "available" defenses against the primary car-

rier, we must determine what defenses are available and to what acts they are applicable.

The only Texas case to address directly a primary carrier's or defense attorney's right to assert affirmative defenses in an equitable subrogation suit is *American Centennial*, though in that case the statements made in the concurrence are dicta and somewhat conclusory. Other jurisdictions, however, have precisely analyzed the use of affirmative defenses by primary carriers and/or defense attorneys in the context of an equitable subrogation action. Moreover, some of these jurisdictions have specifically addressed the use of contributory negligence and/or comparative responsibility as an affirmative defense. We have reviewed many of those cases and find several instructive.

██ Under the traditional concept of equitable subrogation, the subrogee stands in the shoes of the subrogor, and the only defenses available to a defendant sued by the subrogee are those that could have been asserted against the subrogor. *See Guillot v. Hix,* 838 S.W.2d 230, 232 (Tex.1992); *Platte v. Securities Inv. Co.,* 55 S.W.2d 551, 553 (Tex. Comm'n App.1932, judgm't adopted); *Interstate Fire Ins. Co. v. First Tape, Inc.,* 817 S.W.2d 142, 145 (Tex.App.— Houston [1st Dist.] 1991, writ denied); *Sheppard v. State Farm Mut. Auto. Ins. Co.,* 496 S.W.2d 216, 218–19 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). *See also* 16 GEORGE J. COUCH, RONALD A. ANDERSON & MARK S. RHODES, COUCH CYCLOPEDIA OF INSURANCE LAW 2D § 61:224 (rev.ed.1983); 3 ROWLAND H. LONG, THE LAW OF LIABILITY INSURANCE § 23.02[3][a] (1991). Some courts have applied this approach to excess carriers' subrogation actions and have limited the primary carriers' defenses to those which would have been available against the insured. *See, e.g., Puritan Ins. Co. v. Canadian Universal Ins. Co.,* 775 F.2d 76, 80 (3d Cir.1985) (applying Pennsylvania law). Based on the language in the concurrence of *American Centennial,* a majority of the justices of the Texas Supreme Court do not believe this is the approach Texas should take. *See American Centennial,* 843 S.W.2d at 486 (stating primary carrier is entitled to assert any de-

fense available against either the insured or the excess carrier). This court likewise rejects the "traditional" approach because it does not take into account the special nature of an excess insurance policy or the excess carrier's relationship to the insured and the primary carrier. This approach would absolutely prohibit a primary carrier or a defense attorney from asserting the defense of contributory negligence based on actions of the excess carrier, thus leaving primary carriers and defense attorneys without recourse against an manipulative excess carrier. Based on the concurrence in *American Centennial*, we do not believe the majority of the supreme court intended such a result.

To avoid the potential inequity from the "traditional" approach, some courts have adopted the "triangular reciprocity" approach, which imposes a duty of reasonable care on each party, the insured, the primary carrier, and the excess carrier, vis-a-vis each other. *Id.* Under this approach, the parties would be allowed to bring direct actions against one another instead of relying on equitable subrogation. *Id.* Triangular reciprocity has not been widely accepted, and this court cannot find that Texas should follow such an unconventional rule because the supreme court has specifically declined to permit an excess carrier to bring a direct action against a primary carrier. *American Centennial*, 843 S.W.2d at 483.

■■■■■ Rather than follow either of these approaches, Texas should follow an intermediate approach. Under this approach, protection is afforded the primary carrier, yet the excess carrier is not forced to assume duties typically owed by the primary carrier. There are three tenets to this approach: (1) an excess carrier has no greater or lesser rights than those of the insured; (2) an insured's breach of the obligations owed to the primary carrier can defeat a subrogation claim brought by the excess carrier; and (3) active participation by the excess carrier in settlement negotiations may decrease or prevent the excess carrier's recovery. *See Commercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 393 N.W.2d 479, 484–84, 486 (1986). A natural corollary to the first tenet is that the excess carrier owes

no greater or lesser duty to the primary carrier than does the insured. *Certain Underwriters of Lloyd's v. General Accident Ins. Co. of America*, 699 F.Supp. 732, 739 (S.D.Ind.1988), *aff'd*, 909 F.2d 228 (7th Cir. 1990); *see American Centennial*, 843 S.W.2d at 486 (stating excess carrier's unreasonable refusal to cooperate may be asserted as a defense).

With these basic concepts in mind, we now must decide if, and as to what acts, the affirmative defenses of contributory negligence and/or comparative fault apply. Contributory negligence is the failure to use ordinary care to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 520 (Tex.1978). National argues it is erroneous to apply the defense to an excess carrier because an excess carrier has no duty to the insured or the primary carrier until the primary limits have been exhausted. KMC and INA argue that they are not precluded from raising the affirmative defense of contributory negligence based on National's "no duty" argument because contributory negligence does involve the element of duty. We disagree with KMC and INA; Texas law holds that duty is an element of contributory negligence. *See Lewis & Lambert Metal Contractors, Inc. v. Jackson*, 914 S.W.2d 584, 590 (Tex.App.—Dallas 1994), *vacated pursuant to settlement*, 938 S.W.2d 716 (Tex.1997); *Hancock v. City of San Antonio*, 800 S.W.2d 881 (Tex.App.—San Antonio 1990, writ denied); *Rash v. Whisennand*, 453 S.W.2d 353, 358 (Tex.Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.); *Kirby Lumber Corp. v. Murphy*, 271 S.W.2d 672, 677 (Tex.Civ.App.—Beaumont 1954, no writ); *see also Certain Underwriters*, 699 F.Supp. at 739.

■■■■ In *Hancock*, the plaintiffs sued the owners of an apartment complex, the City of San Antonio, and others for the wrongful death of Ella Saenz, who died of injuries received in an explosion at an apartment complex. 800 S.W.2d at 883. The jury found Saenz's daughter contributorily negli-

gent and the plaintiffs appealed this finding. *Id.* The plaintiffs/appellants argued there was no duty on the part of the daughter of the deceased to protect against the danger of an explosion, and therefore, the jury's finding of contributory negligence was erroneous. *Id.* The defendant/appellees responded that whether the daughter owed a duty to the deceased was irrelevant to the issue of whether she was contributorily negligent. *Id.* at 884–85. The court disagreed stating that under Texas law, negligence is based on a violation of a duty. *Id.* We agree that duty is an element of contributory negligence. Thus, for the defense of contributory negligence to be "available" to a primary carrier or a defense attorney, the excess carrier must have had a duty to do the act that is asserted to have been negligently performed or omitted.

We then must determine what duties an excess carrier has, if any, and when they arise. In *Emscor, Inc. v. Alliance Ins. Group,* 804 S.W.2d 195, 196 (Tex.App.— Houston [14th Dist.] 1991, no writ), an insured filed a declaratory judgment action to determine whether its excess carrier, Alliance, had a duty to defend the insured in a negligence suit. The insured claimed that when its primary carrier, Stone Mountain became insolvent, the terms of the policy required Alliance to provide a defense. *Id.* The trial court granted summary judgment in favor of Alliance. *Id.* On appeal, the court affirmed the summary judgment in favor of Alliance holding that under the terms of the standard excess insurance policy, Alliance, an excess carrier, had no duty to defend the insured because Alliance was providing liability coverage to the insured "in excess of the liability coverage provided by Stone Mountain," the primary carrier. *Id.* at 198. Unless and until the primary limits of $500,000 were exhausted, Alliance had no duty to defend the insured, even if the primary carrier was insolvent. *Id.* at 198–99.

In a second suit between the same parties, the insured sued Alliance alleging Alliance was liable for wrongfully refusing to settle the negligence suit filed against the insured. *Emscor Mfg.,* 879 S.W.2d at 896. Alliance filed a motion for summary judgment con-

tending that, although the insured had requested that Alliance tender the limits of its excess coverage, Alliance had no duty to tender its limits because the primary limits had not been tendered or otherwise exhausted. *See id.* at 901. The trial court granted summary judgment for Alliance, and the insured appealed to this court. *Emscor,* 879 S.W.2d at 901.

The issue on appeal was whether there was a tender or exhaustion of the primary limits under the terms of the excess policy. *Id.* at 902–03. The resolution of this issue determined whether Alliance, the excess carrier, had a duty to cooperate and settle the underlying suit. *See id.* After discussing the nature of primary versus excess insurance coverage, this court held that Alliance had no duty to investigate, negotiate, or defend the insured. *Emscor,* 879 S.W.2d at 909. We based our decision on Texas law that does not recognize a right by an insured to sue its excess carrier under *Stowers* and *Ranger County.* Under these two cases, it is the *primary* carrier who owes duties to the insured, not the excess carrier. *Ranger County,* 723 S.W.2d at 659; *Stowers,* 15 S.W.2d at 546–47. Thus, under this court's decision in *Emscor,* the duty of an excess carrier to cooperate in the defense and settlement of a suit against its insured does not arise unless and until the primary policy limits are exhausted or tendered. As the California court stated in *Continental Cas. Co. v. Royal Ins. Co. of Am.,* 219 Cal. App.3d 111, 268 Cal.Rptr. 193, 196 (1990), there is no authority that holds an excess carrier should be charged with making sure the primary carrier fulfills its good faith obligations to the insured. Thus, evidence of an excess carrier's conduct prior to the time any duties arise is irrelevant. *See id.* This rule is followed by most jurisdictions that have considered the question. *Texas Employers Ins. Ass'n v. Underwriting Members of Lloyds,* 836 F.Supp. 398, 404 (S.D.Tex.1993) (citing *Signal Cos. v. Harbor Ins. Co.,* 27 Cal.3d 359, 165 Cal.Rptr. 799, 804, 612 P.2d 889, 894 (1980) (en banc); *Colorado Farm Bureau Mut. Ins. Co. v. North Am. Reinsurance Corp.,* 802 P.2d 1196, 1198 (Colo.Ct.App. 1990); *Occidental Fire & Cas. Co. of North Carolina v. Underwriters at Lloyd's, Lon-*

*don,* 19 Ill.App.3d 265, 311 N.E.2d 330, 334 (1974); *Fireman's Fund Ins. Co. v. Rairigh,* 59 Md.App. 305, 475 A.2d 509, 517 (1984); *United States Fire Ins. Co. v. Roberts and Schaefer Co.,* 37 Wash.App. 683, 683 P.2d 600, 603 (1984)). A minority, however, hold that excess carriers must participate in the defense when it is clear that the potential judgment against the insured may be substantially greater than the amount of the insured's primary limits. *Texas Employers,* 836 F.Supp. at 405 (citing *Celina Mut. Ins. Co. v. Citizens Ins. Co.,* 133 Mich.App. 655, 349 N.W.2d 547, 550 (1984); *American Excess Ins. Co. v. MGM Grand Hotels, Inc.,* 102 Nev. 601, 729 P.2d 1352, 1354 (1986)).

▆▆▆ While we find that an excess carrier has a duty not to refuse unreasonably to cooperate once it is required to, i.e., once the primary limits are exhausted, and is not entitled to not actively disrupt the defense or settlement of the underlying suit, we refuse to find it has to undertake any duties until the primary limits are exhausted. *See Emscor,* 879 S.W.2d at 909. Because duty is an element of contributory negligence, and an excess carrier has no duty until the primary limits are exhausted, its acts before that time cannot form the basis for the affirmative defense of contributory negligence or comparative fault. Therefore, we hold that under Texas law, contributory negligence and/or comparative fault are "available" as defenses against the excess carrier only for acts the carrier negligently undertakes or refuses to undertake after the exhaustion, by tender or pay out, of the primary policy limits.

▆▆▆ This holding is logical based on the divergent nature of primary and excess insurance coverage. There is no dispute in this case that the policy issued by National to Granada was a typical excess insurance policy. A review of the policy shows that it covered only those losses which exceeded Granada's primary insurance policy limits. Primary insurance coverage is insurance coverage whereby, under the terms of the policy, duties arise immediately upon the happening of the occurrence that gives rise to liability. *Emscor,* 879 S.W.2d at 903 (quoting *Union Indem. Ins. Co. of New York v. Cer-*

*tain Underwriters at Lloyd's,* 614 F.Supp. 1015, 1017 (S.D.Tex.1985)). A primary carrier typically has more rights and obligations than an excess carrier. For example, primary carriers generally have a duty to defend the insured, but typically have the right to decide when a claim should be settled or whether it should be tried. *Certain Underwriters,* 699 F.Supp. at 738 (citing *Puritan Ins. Co. v. Canadian Universal Ins. Co.,* 775 F.2d 76, 79 (3d Cir.1985)). On average, most claims are within primary limits, creating greater chance of exposure to the primary carrier. *Id.* Because of its frequent exposure and duty to defend, primary carriers charge larger premium for coverage than do excess carriers. *Id.*

▆▆▆ An excess policy, on the other hand, is one that provides that the excess carrier is liable for the excess above and beyond that which may be collected on primary insurance. *Emscor,* 879 S.W.2d at 903 (quoting *Certain Underwriters,* 614 F.Supp. at 1017). Because of the nature of the standard excess policy, an excess carrier's obligations do not generally arise until the primary limits are exhausted. *Certain Underwriters,* 699 F.Supp. at 738 (citing *Puritan,* 775 F.2d at 79). The remote position of the excess carrier greatly reduces its chance of exposure to a loss, and therefore, an excess carrier charges lower insurance premiums. *Id.; Emscor,* 879 S.W.2d at 903 (quoting *Certain Underwriters,* 614 F.Supp. at 1017). Clearly, when there are primary and excess insurance coverages, the various insurance companies are not covering the same risk; rather, they are covering separate and clearly defined layers of risk. *Emscor,* 879 S.W.2d at 903 (quoting *Certain Underwriters,* 614 F.Supp. at 1017). If we were to increase the duties owed by the excess carrier to the insured, or create duties toward the primary carrier, the insured's excess premiums would correspondingly increase. In other words, rather than excess coverage, the insured would essentially have two primary carriers, thereby destroying excess coverage.

▆▆▆ We find that the approach taken by this court protects the primary carrier, the excess carrier, and comports with the basic

conclusions of the majority of the supreme court justices. Moreover, it comports with Texas law concerning the duties of excess carriers and the nature of excess insurance. Furthermore, it does not violate chapter 33 of the Texas Civil Practice and Remedies Code because it does allow the primary carrier and the defense attorney to assert contributory negligence; it merely limits the defense to the time when a duty actually arises. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 33.001–33.011 (Vernon 1997).[9] Therefore, we hold that neither KMC nor INA may allege as contributory negligence any acts or omissions by National before INA tendered its primary limits. As to time period after the tender, both KMC and INA are free to assert that those acts or omissions by National were negligent. Because the record shows that some of the allegations made by KMC and INA of National's alleged contributory negligence might have occurred post-tender, we must reverse the partial summary judgment granted in favor of National.[10] National failed to negate all of the acts subject to allegations of contributory negligence and/or comparative responsibility, and therefore, the trial court erred in striking these affirmative defenses. We sustain KMC's conditional cross-point and INA's seventh and eighth points of error.

## CONCLUSION

We hold the trial court erred in finding the release barred National's and INA's claims against KMC, and therefore, we sustain points of error two and three raised by Na-

tional and points of error one through four raised by INA. We further hold the trial court erred in granting summary judgment in favor of KMC on the issue of lost profits, and sustain National's fourth and fifth points of error. We find the trial court correctly granted summary judgment in favor KMC on the issue of punitive damages, and thereby overrule National's sixth and seventh points of error. Likewise, we find the trial court correctly ruled that an excess carrier cannot bring claims for gross negligence or violation of the DTPA or Insurance Code against a primary carrier, and thus, we overrule National's points of error eight through ten. Finally, we sustain KMC's conditional cross-point and INA's seventh and eight points of error on the issue of the affirmative defenses. The trial court erred in granting summary judgment in favor of National on the affirmative defenses raised by KMC and INA. Based on our rulings, we affirm the trial court's summary judgment in favor of KMC on the issue of punitive damages; however, we reverse and remand the case on the remaining issues for further action consistent with this court's opinion.

EDELMAN, J., concurring in result only.

---

9. Chapter 33 of the Texas Civil Practice and Remedies Codes addresses comparative responsibility between parties in negligence actions. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 33.001–33.017 (Vernon 1997).

10. In its brief, KMC alleges the following acts of negligence by National: (1) failure to investigate coverage, liability, and damages in the underlying suit; (2) failure to issue a reservation of rights and preserve coverage questions against Granada; (3) failure to maintain and establish a diary system for active claim files; (4) failure to timely establish a claims file for Granada; (4) misplacing Granada's claim file; (5) failure to demand that the underlying claim be settled within the primary limits; (6) failure to hire a coverage attorney to review the coverage questions; (7) failure to appear for a deposition in the

underlying suit; (8) failure to cooperate in the defense and initial settlement negotiations; (9) failure to respond to two settlement brochures containing demands in excess of $3 million; (10) voluntarily paying $6 million to the Wolf Point plaintiffs in the absence of coverage; (11) failure to exercise proper personnel management at the time of the underlying suit; and (12) failure to have a representative present at the trial when all demands exceeded the primary limits. With the possible exception of (10) through (12), we note that the allegations involve actions or omissions by National that occurred "pre-tender." We reiterate that only those acts or omissions that occur after the exhaustion of the primary insurance limits are "available" as allegations for the affirmative defense of contributory negligence.